# CHARLESTON

## STATE v. CLARK.

## Submitted June 9, 1908.   Decided  December 22, 1908.

1. GRAND JURY—*Conduct of Proceedings—Evidence.*
    The general rule is that an indictment must be based upon legal evidence, without which it should not be returned; but grand juries are not held to the same technical rules of evidence as petit juries where their action is being passed upon by the court. (p. 629.)

2. SAME—*Effect of Improper Evidence.*
    The mere fact that some illegal or improper evidence may have been submitted to the grand jury, or that certain witnesses who gave evidence may have been disqualified, will not invalidate an indictment, if the grand jury had some legal and competent evidence before them on which to found the same.   (p. 629.)

3. CRIMINAL LAW—*Plea in Abatement—Sufficiency of Indictment.*
    The question of the legality of the evidence upon which an indictment is found can only be presented by plea in abatement, upon which an issue of fact as to the competency and sufficiency thereof may be tried.   (p. 629.)

4. GRAND JURY—*Conduct of Proceeding—Evidence—Dying Declaration.*
    If a proper predicate is laid for the admission thereof, a dying declaration, limited to such facts as the declarant could have testified to if living, being legal and competent evidence, upon a trial for murder, is legal and competent evidence upon which to found an indictment for murder.   (p 629.)

40

5.  INDICTMENT AND INFORMATION—*Evidence—Dying Declaration—Indorsement of Names of Witnesses.*

    An indictment for murder will not be quashed because it appears on the face thereof to have been founded upon a dying declaration, although the names of no witnesses are indorsed thereon, and it does not affirmatively appear therefrom that a proper predicate was laid for the admission of such dying declaration. (p. 630.)

6.  CRIMINAL LAW—*Review—Harmless Error—Reception of Evidence.*

    Although on a trial for murder, evidence is received in the presence of the jury, intended for the court, to lay the foundation for admitting a dying declaration, this will not constitute reversible error. (p. 630.)

7.  SAME—*Trial—Reception of Evidence—Best and Secondary.*

    Although on a trial for murder, a proper predicate being laid therefor, proof of the loss of a written dying declaration, and oral evidence of the contents thereof, is received, it will not be error for the court on the discovery and production of the written declaration during the progress of the trial to admit it in evidence as a substitute for and in place of the oral evidence received, the original being the best evidence, the oral evidence, secondary only. (p. 631.)

8.  HOMICIDE—*Dying Declaration—Exact Words of Declarant.*

    A dying declaration when offered in evidence on a trial for murder, a proper predicate being laid therefor, will not be excluded because it appears that the words employed therein by the person who took down the statement of the declarant are not the exact words employed by declarant, if it further appears that after being prepared the declaration was read over to declarant and ratified by him. (p. 631.)

9.  SAME—*Condition of Declarant.*

    If the condition of declarant at the time of making his dying declaration, the nature of his wounds, the length of time after making the same before expiring, and all the circumstances make a *prima facie* case that he was then in the article of death, and conscious of his condition when he made it, such evidence should be admitted by the court, as making a *prima facie* case for the admission of such dying declaration. (p. 632.)

10.  SAME—*Review—Admission of Dying Declaration.*

     The rule that a court will not interfere with the action of the lower court in admitting evidence, unless it can see that the court below clearly erred, is applicable to the admission of dying declarations. (p. 632.)

11.  SAME—*Dying Declaration—Preliminary Evidence.*

     The fact that a witness is permitted to testify that a dying dec-

laration was made under oath will not be treated as reversible error, as giving undue prominence to that fact appearing on the face thereof. (p. 633.)

12. CRIMINAL LAW— *Trial—Reception of Evidence.*

A fact brought out on proper cross-examination of one being tried for murder, and going to the prisoner's credibility as a witness, although touching incidentally on his character, not put in issue by him, will not constitute reversible error. (p. 635.)

13. SAME—*Best and Secondary Evidence—Collateral Matters.*

Where upon a trial for murder the official character of a public officer is only incidentally and collaterally involved, the record evidence of his appointment and qualification is not necessary; evidence that he was known to be and acted as such officer being sufficient. (p. 635.)

14. SAME—*Instructions—Different Theories.*

The giving of an instruction based on one theory, unless binding, is not to ignore other theories or instructions based thereon, though the theories upon which such instructions are based be inconsistent. The object and office of an instruction is to define for the jury, and to direct their attention to, the legal principles which apply to, and govern, the facts, ˙proved or presumed, in the case. (p. 636.)

15. SAME—*Instructions—Weight of Evidence.*

An instruction with respect to the weight and credibility to be given to the testimony of witnesses, who, in the judgment of the jury, may have willfully and corruptly sworn falsely, which tells the jury that they are at liberty to reject all of such evidence not corroborated by other testimony, or give it such weight and credit as in their judgment, from the circumstances, it is entitled to, is legal and proper. Point two of the syllabus in *State* v. *Musgrave,* 43 W. Va. 672, in so far as it holds to the contrary, is disapproved. p. 636.)

16. SAME—*Instructions—Assumptions as to Facts.*

On a trial for murder the court instructed the jury that if they found from the evidence that shortly before, or at the time of the shooting, the accused in the presence of the constable was guilty of contending with angry words to the disturbance of the peace, that such swearing was an offense under the laws of this State justifying his arrest without warrant: *Held,* such instruction not erroneous as assuming by the words "such swearing" the fact submitted to the jury, the evidence on which the instruction was based tending to show that the angry words attributed to the prisoner were words of swearing. (p. 638.)

17. HOMICIDE—*Self Defense—Resisting Unlawful Arrest.*

In exercising one's right to resist an illegal arrest he has no right, in order to retain or regain his liberty, to take the life of

the officer, unless he has reason to believe and does believe he is. in imminent danger, and that it is necessary to do so in order to save his own life, or to save himself from some great bodily harm; and an instruction purporting to define such right, which omits to so state the law to the jury, is erroneous.   (pp. 641, 642.)

18.  CRIMINAL LAW—*Instructions—Statutory Provisions—Mandatory.*
    The provisions of section 5, chapter 38, Acts 1907, providing for the giving and reading of instructions to the jury and the order in which they shall be read are mandatory, not merely directory. (p. 644.)

19.  HOMICIDE—*Instructions—Dying Declaration.*
    A dying declaration being legal and competent evidence on a trial for murder, though not made under oath, it is improper for the court in an instruction to the jury to attempt to discredit the same or deprive it of its proper probative force by calling the jury's attention to the fact that such declaration "was not taken and made under the sanction of a judicial oath."   (p. 644.)

20.  CRIMINAL LAW—*Instructions—Statutory Provisions—Waiver.*
    Although it is the right of a party to have the instructions to the jury given and read as required by section 5, chapter 38, Acts 1907, yet he may waive this right, and will be regarded as having done so, unless he objects and excepts to the action of the court at the time and before the jury retires to consider of its verdict. (p. 645.)

Error to Circuit Court, Summers County.

Frank Clark was convicted of murder in the second degree, and he brings error.

                                            *Affirmed.*

OSENTON & McPEAK, T. G. MANN, and W. H. SAWYER, for plaintiff in error.

WM. G. CONLEY, Attorney-General, and R. F. DUNLAP, for the State.

MILLER, JUDGE:

The indictment charged defendant with the murder of T. P. Withrow. The jury found him not guilty of murder in the first degree, but of murder in the second degree, as charged; and the judgment was that he be confined in the penitentiary for the term of twelve years.

Nineteen alleged errors committed in his trial are assigned, but, in the brief of counsel, some are not discussed or seriously urged, although counsel say they believe they are

entitled to the careful consideration of the Court. We have considered them all in passing to those specially relied upon.

First, as to the prisoner's motion to quash the indictment. The ground of the motion was that it was found upon illegal and incompetent evidence, reciting on its face that it was "found * * upon the information of the dying statement of T. P. Withrow, sworn in court and sent before the Grand Jury to give evidence to that body." There may have been more than one dying declaration. Was this evidence legal and competent? The general rule is that an indictment must be based upon legal evidence, and without it an indictment should not be returned. 20 Cyc. 1346. But as this authority says: "While this rule is laid down for the guidance of grand juries they are not as a matter of fact held to the same technical rules of evidence as petit jurors, where their action is being passed upon by the courts." And in the same connection: "It is very generally conceded that the mere fact that some illegal or improper evidence has been received before the grand jury, or that certain witnesses examined were disqualified to testify, will not invalidate an indictment where other legal evidence was received in its support." But this question must be presented by plea in abatement, upon which an issue of fact as to the competency and sufficiency of the evidence may be tried. 22 Cyc. 205, and cases cited in note 14. No such plea was filed and consequently we have not before us, by bill of exceptions or otherwise, the dying declaration presented to the grand jury.

The sole question then is whether, as a matter of law, a dying declaration is competent evidence upon which to found an indictment for murder. We think the answer should be in the affirmative. We need not cite authorities for the proposition that dying declarations are admissible evidence on a trial for murder; but they are generally limited to such facts as the declarant could have testified to if living. 4 Elliott on Evidence, section 3033, page 324; *State* v. *Meyer*, 86 Am. St. Rep., note page 640. It may be that a proper predicate should be laid for the admission of such declarations, when not admissible as part of the *res gestae*, the same as upon the trial before the jury. It does

not appear whether or not such foundation was laid before the grand jury. True, the names of no witnesses are endorsed on the indictment, but this requirement of the statute has been held directory only, not mandatory. *State* v. *Enoch*, 26 W. Va. 253; *State* v. *Shores*, 31 W. Va. 491. A dying declaration, if competent, is entitled to the same consideration as if the witness was living and examined upon his oath before the jury. We see no reason therefore why an indictment may not be found upon such evidence.

The law is: "That if there was any legal evidence before the grand jury, the court will not inquire into its sufficiency; nor will it quash the indictment in such a case because some illegal evidence was also received." 22 Cyc. 206; *State* v. *Woodrow*, 58 W. Va. 532. Upon the face of the indictment, therefore, we conclude that there was no error in overruling the motion to quash.

The second and third assignments of error relate to the admission of the testimony of Dr. Cooper, and of Dunlap, the prosecuting attorney, relating to the condition of the deceased at the time of his dying declaration. It is claimed this was evidence for the court and not for the jury. This is true; but as the evidence was received to lay the foundation for admitting the dying declaration, the court committed no reversible error in receiving the evidence in presence of the jury. *State* v. *Cain*, 20 W. Va. 679.

The other errors assigned, but not especially urged, will be sufficiently covered by our response to those which are argued and relied on. The first of these is, that there was no sufficient foundation laid for the admission of the dying declaration of the deceased. The rule is that dying declarations to be legal and competent evidence must appear to have been made when the declarant was under the sense of impending death, and without any expectation or hope of recovery. 1 Greenleaf on Ev., sections 156-161; 4 Elliott on Ev., section 3032, 3033; 4 Ency. Dig. Va. and W. Va. Rep. 847-848. The solemnity of the situation is regarded as a substitute for the solemn obligation of an oath administered in a court of justice. *Swisher* v. *Commonwealth*, 26 Grat. 964. And the burden of laying a proper predicate

for the admissions of such declarations is upon the one offering them. 4 Elliott on Ev., section 3033; *Hill* v. *Commonwealth*, 2 Grat. 594.

Was proper foundation laid in this case? In the beginning of the trial, oral evidence of the loss and contents thereof, and of the condition of the deceased at the time of making his dying declaration was received. Later the writing was found and admitted in evidence, and the oral evidence of the contents thereof was stricken out, but not what deceased had said to witness regarding his condition at the time of making the dying declaration. We think this proper practice. The writing was the best evidence, the oral evidence secondary only. When the writing was found it was proper to substitute it in place of the oral evidence. *State* v. *Meyer*, 86 Am. St. Rep., Note V, and cases, 642-643. In the written declaration signed and sworn to by deceased, he says: "I realize my serious condition and that death is imminent, and that death is liable to occur at any minute. The Doctor has told me this." It is conceded that if this recital in the paper itself represented the true state of the declarant's mind, the paper was properly admitted; but it is claimed that the oral evidence of the witness Dunlap, who was present and interrogated the deceased, and reduced his declaration to writing, shows that words not used by declarant were employed. For example, the word "imminent" was probably not the word used by him, but one selected by Dunlap to convey the meaning of the deceased. It appears, however, that after the paper was thus prepared it was read over to declarant, adopted and sworn to by him. But it is claimed the evidence of Dr. Cooper tends to contradict or impeach the written statement. His evidence was that he asked deceased what he thought of his condition; and, as is usually the case, he did not seem to have any opinion as to how serious his condition was, that he was comfortable then, but that he went on to tell him of the shot he had and the injuries done, and there was practically no hope for him; that he "didn't say to him there was absolutely none, but probably made use of the expression that it wasn't one in a hundred, or something of that kind;" that he told deceased this about half an hour before he made his state-

ment to Dunlap. He also testified that deceased was shot in the abdomen, the ball or balls making as many as twenty-one holes in the bowels, severing also some large blood vessels, all likely to cause death; and, besides these, other wounds from other shots fired in other parts of his body were of a serious character. The evidence of Dunlap is positive that deceased understood his condition, and that he had no hope of recovery; that after the statement was prepared it was read over to declarant, signed, sworn to as prepared, and adopted by him. It is not necessary that the exact words of declarant should be used. *State* v. *Baldwin*, 15 Wash. 15; 45 Pac. Rep. 650. The answers he gives may even be responsive to leading questions, and the words actually employed, though not those actually used by declarant, may be subsequently ratified by him. *State* v. *Meyer*, *supra*, note pages 643-644-647, citing, among other cases, *Vass* v. *Com.*, 3 Leigh 786; *Carver* v. *U. S.*, 160 U. S. 553; *State* v. *Evans*, 124 Mo. 397. It was a question of law for the court, from all the evidence, whether or not the declaration should go in evidence. *Swisher* v. *Com.*, *supra; State* v. *Cain*, 20 W. Va. 679; *Vass* v. *Com.*, *supra*. If the condition of the wounded party, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a *prima facie* case that he was in the article of death, and conscious of his condition when he made them, such declarations should be admitted in evidence by the court as making a *prima facie* case. *State* v. *Jones*, (Ga.) 60 S. E. Rep. 840; *State* v. *Robinson*, (Ga.) *Id.* 1005; *State* v. *Franklin*, (S. C.) *Id.* 953, 954; *State* v. *Gallman*, (S. C.) *Id.* 682, 685. It was clearly shown, we think, that the declarant was in *Articulo Mortis* at the time he made his declaration. He had been mortally wounded; this was the doctor's opinion confirmed by the death of decedent about four hours later. While the doctor says he had not told deceased there was absolutely no hope, he admits he told him there wasn't one chance in a hundred. It is evident deceased interpreted this language to mean he had no chance at all, and that he understood and appreciated his condition; he says so, and we think a *prima facie* case was made for the admission of the paper. An appellate court will not interfere

with the action of the lower court in admitting evidence, unless it can see the court below clearly erred. This rule is applicable to the admission of dying declarations. *State* v. *Franklin* (S. C.) 60 S. E. Rep. 953.

The admission of the evidence of Dunlap, that the written declaration was under oath is assigned as error. The fact sufficiently appearing on the face of the paper, it is claimed this testimony tended to emphasize that fact, giving it greater force with the jury possibly than it otherwise would have had. We do not think this point has any merit. A dying declaration may be sworn to or not. Bishop's New Crim. Proc., section 1213; and is not inadmissible because sworn to. *State* v. *Talbert*, (S. C.) 19 S. E. Rep. 852; nor does the oath give it any additional force or weight. *State* v. *Frazier*, (Del.) 1 Houst, C. C. 176. We do not see, therefore, how this oral evidence could have prejudiced the defendant.

Another point is that the court below permitted defendant's character, not put in issue by him, to be attacked in three ways: (1) by the evidence of Read, prosecuting attorney, that defendant had had a fight with one Grummell some time before; (2) by the reference of Read while on the stand to defendant as an "unfortunate criminal"; and (3) by permitting the prosecuting attorney, on cross-examination, to ask the defendant "how long he had been confined in the West Virginia Reform School." As to the fight with Grummell: This was brought out on cross-examination of the witness by the prisoner's counsel. Counsel was pressing witness to know how, when defendant had made a certain statement to him, he could have known witness was a lawyer: and his answer was, because he had once consulted him "about a fight he had with Grummell" against whom he wanted to make a case. We see nothing prejudicial to defendant in this reply. Besides the record shows the answer was objected to by some one and the objection sustained by the court.

The reference to defendant as an "unfortunate criminal" was merely by indirection, and on cross-examination. Counsel inquired of witness whether the fact that he was counsel on the side of the State, did not prejudice him on that side. He answered, "It does in some cases

but not in this one." Counsel then inquired: "Not a. bit in the world?" and the witness answered: "No, sir; where an unfortunate criminal is being tried I have no feeling against him." It seems to us this reply was rather favorable to the defendant, and calculated to gain for him the sympathy of the jury. But counsel for defendant have evidently failed to notice that the court below on his. motion struck out this answer of the witness.

The fact that the defendant at one time had been in the West Virginia Reform School was brought out unwittingly on cross-examination of the prisoner by the State. In chief, .defendant had referred to the Green Sulphur Baptist Church as the place he had last met Withrow, some nine years. before his death. In reply to a question of his counsel: " Was he living there at that time, or had he been?" the prisoner answered: " He had been to the West Virginia Reform School and just returned." In referring to this. meeting, counsel for the State on cross-examination, inquired: " Did you say after you came back from the Reform School or after he came back from the Reform School?" Defendant replied: "After he came back." Immediately after this answer the attorney for the State asked the prisoner the following question: " Was that before or after you came back from the Reform School?" and objection being made, it was sustained. To the State's question: " Where did you go when you first left home?" the witness volunteered the answer: " I went to the West Virginia Reform School," to which answer there was no objection, and the State followed this by the question: " How long did you stay there?" and the prisoner answered: "I remained there 26 months." We think this was legitimate cross examination. The court was quite careful to guard every right. of the prisoner therein. The fact thus developed went to the prisoner's credibility as a witness, and was proper, even though it touched incidentally on his character. *People* v. *Courtney*, 31 Hun. 199; *Com.* v. *Bonner*, 97 Mass. 589; *People* v. *Hovey*, 29 Hun. 382; *Abbotts Trial Brief*, Crim. Cases, 389.

It is next assigned as error, that the court admitted oral evidence of the official character of Withrow. John Richmond, a justice of Summers county for four years, had testi-

fied without objection that Withrow was constable of that county. The court afterwards sustained an objection to this question: " Was he such constable at the date of his death?" but overruled objection to the next question: " Was he such constable at the time he was shot?", and the witness answered: " Yes, sir". Besides this evidence, other witnesses, particularly, Andy Ward, testified as to the official character of Withrow; and at the very time of his killing the proof is that he was acting in his official capacity in attempting to make the arrest of defendant. It is admitted by prisoner's counsel that the record evidence of the official character of an officer is not required where it has been proved he has been acting openly as such officer. But it is insisted that no proof of this character was offered. We think that there is enough evidence in the record to meet this objection; besides, the official character of the officer was only incidentally and collaterally involved. In such case the record evidence is not necessary. *Callison* v. *Hedrick*, 15 Grat. Anno., side page 248; 2 Wigmore on Ev., sections 1228, 1252; 4 Wigmore on Ev., sec. 2534.

The remaining points of error relate to instructions given and refused. First, as to the instructions of the State. The giving of instructions numbered four and six was objected to and assigned as error, but apparently not relied on here, and we see no error therein.

Instruction number two is said to be inapt and prejudicial to defendant in two particulars; first, that it ignored the element of accidental shooting; second, that it ignored the theory that the shooting was done while lawfully resisting an illegal arrest. This instruction propounded the general proposition, approved in *State* v. *Welch*, 36 W. Va. 697, and *State* v. *Hobbs*, 37 W, Va. 819, that killing by a deadly weapon in the hands of the prisoner is presumed to be murder in the second degree, that if the State would elevate it to first degree murder the burden of establishing the characteristics of that crime is upon it; if the prisoner would reduce it to manslaughter, the burden is upon him. For the first proposition, *State* v. *Cross*, 42 W. Va. 253, is relied on. But as said by JUDGE POFFENBARGER in *State* v. *Clifford*, 59 W. Va. 1, 22: "The theory upon which the majority of the Court reached a conclusion in that case is made

very plain by the opinion. They said 'There was no evidence of premeditated or intentional killing'. If not, no instruction based upon such theory could properly be given and every instruction that presented any hypothesis of guilt of such offense was held improper." There is, in this case, no appreciable amount of evidence upon which to base the theory of accidental shooting. As said in *State* v. *Clifford*, "In determining what instructions shall be given, the court does not consider the weight of any evidence. It simply lays down rules for the analysis and application thereof by the jury." The giving of an instruction based on one theory, unless binding, is not to ignore other theories or instructions based thereon, though the theories be inconsistent. This is permissible. The same answer is applicable to the criticism based on the theory of resisting an illegal arrest. This theory is fully covered by other instructions given, and the one under consideration can not be said to ignore any of them, or any theory on which they are based.

Instructions numbered three and five are said to be bad, because mere abstract propositions of, law. In effect they tell the jury, in forms approved in *State* v. *Welch*, 36 W. Va., that to constitute willful, deliberate and premeditated killing—murder in the first degree—it is not necessary that the intention should exist for any particular length of time prior to the actual killing, it being only necessary that such intention should come into existence for the first at the time of the killing, or previously; that it is not necessary that malice should have existed for any particular period, or that the prisoner should have contemplated the homicide; that if the intent to kill is executed the instant it springs into the mind, the offense is as truly murder, as if it had dwelt there for a longer period. It is said instruction number three entirely ignores the provocation for the act and the hot blood engendered thereby; that instruction number five would not be correct in every case because an intention to kill, engendered by sufficient provocation, is effected by cooling time, and that if the provocation is sufficient and the killing is executed at the time the intention springs into the mind it is manslaughter; if it lingers in the mind after cooling time it is murder and not manslaughter,

We reply that other instructions of defendant given fully
cover these theories, and the jury could not have been mis-
led by these instructions of the state. As was said in State
v. Dodds, 54 W. Va. 295: "It is the object and office of
instruction to define for the jury, and to direct their atten-
tion to, the legal principles which apply to, and govern,.
the facts, proved ·or presumed, in the case." And,.
quoting from Bish. Crim. Proc., section 978, it is said.
in the same connection: "The charge should simply de-
velop the rules of law governing the particular facts—all
the facts, not a part only, which the evidence tends to es-
tablish; and it is to be interpreted and judged of, not in any
abstract way, but with reference to those facts." And
quoting Sackett's Instructions, the court further says: "A
charge to the jury must be taken together, and it is not.
necessary to insert in each separate instruction all the ex-
ceptions, limitations and conditions which are inserted in.
the charge as a whole." To the same effect is State v. Clif-
ford, supra, syllabus, point 8. We see no error in these
instructions.

Next as to instruction number twelve. This instruction
related to the weight and credibility to be given to the testi-
mony of witnesses, who, in the judgment of the jury, might
have wilfully and corruptly sworn falsely. With respect to·
such testimony, it said they were at liberty to reject all of
it not corroborated by other testimony, or give it such weight.
and credit as in their judgment, from the circumstances, it,
was entitled to. In effect it is the same as the instruction
number three modified and approved in State v. Thompson,.
21 W. Va. 741, 758. As originally propounded the instruc-
tion in that case told the jury that they were to disregard.
each and every material fact sworn to on the trial by such..
witnesses except as corroborated by other creditable
evidence in the case. As modified by the court below and
approved by this Court, the jury were told that they might.
give such weight to such evidence on other points as.
they might think it entitled to and that the jury were the
exclusive judges of the testimony. In Thompson on Trials,.
section 2425, this instruction is approved as a good
model.

Counsel for prisoner, however, contends that the second.

point of the syllabus in *State* v. *Musgrave*, 43 W. Va. 672, holds this instruction bad; and it seems that by some inadvertence this case does to some extent condemn that instruction. *Thompson's Case* is referred to as approving this point, but the contrary is the fact, and it is plainly to be seen from the opinion prepared by JUDGE ENGLISH that it is intended to approve the instruction in *Thompson's Case*. The opinion quotes extensively from the argument of JUDGE GREEN in that case, directed against instruction number three as originally propounded. We have, since *State* v. *Musgrave* was decided, approved the rule of *Thompson's Case*, notably in *Ward* v. *Brown*, 53 W. Va. 227, where it is held that "An instruction which tells the jury that, if they believe any witness has testified falsely in the case as to the material matters, they may disregard such false testimony or give to it and all the evidence of such witness such weight as they believe it entitled to, is improper in failing to inform the jury that they may disregard all the evidence of such witness." It will thus appear that in that case the instruction was held bad because it did not inform the jury that they might reject the whole of the testimony of such witnesses. The doctrine of *Thompson's Case* was later approved in *Cobb* v. *Dunlevie*, 63 W. Va. 398, (60 S. E. Rep. 384). So far, therefore, as point two of the syllabus in *State* v. *Musgrave* is in conflict with *State* v. *Thompson* and these later decisions it must be disapproved.

It is next objected that State's instruction number fourteen was erroneous and prejudicial. That instruction is as follows: "The Court further instructs the Jury that if they believe from the evidence beyond a reasonable doubt, that at the time of the shooting of T. P. Withrow, by the accused the said T. P. Withrow was then and there a Constable of Summers county, for Green Sulphur District, of said county, and that shortly before or at the time of said shooting the accused was in the presence of said Withrow guilty of contending with angry words to the disturbance of the peace in said District, that such swearing was an offense under the laws of this state which if committed in the presence of such Constables was just legal cause for the arrest of the accused by said Constable without a warrant."

It is objected to this instruction, first, that it assumes the fact denied by the prisoner that he was guilty of swearing before his attempted arrest by Withrow; second, that swearing, unless it be profane, does not constitute an offense in this State, and that profane swearing is a statutory and not a common law offense, and does not constitute a breach of the peace, unless coupled with a threat of violence. Section 4489, Code 1906, covering the offenses for which a constable may, without a warrant, or other process or proof, arrest an offending person, it is said does not include such statutory or common law offenses, and therefore, under the maxim *expressio unius est exclusio alterius*, any offense not covered by the statute must be regarded as excluded from the operation thereof. It is true the prisoner by indirection denies that he was guilty of swearing. In his testimony in chief he says he said nothing to Withrow, or to the old man Ward, or Minnie Ward; but he is contradicted in this statement by the dying declaration of Withrow, and by the other witnesses present; but it was on the evidence of other witnesses, not his, that the instruction was predicated. The dying declaration of Withrow says that Clark stepped up to Ward and said: "What are you doing running around with this woman?" that Ward replied "it was none of his business" and wanted Clark to go away and let him alone, that Clark then swore "by God that he didn't have to go away and that he couldn't make him go away;" that Ward then told Withrow to take him away; that when, he, Withrow, told Clark to go on away he swore "by God he didn't have to go." Other witnesses corroborate this statement of Withrow. While the language of the instruction might have been differently worded, we do not think it assumes the prisoner had been guilty of swearing. The words, "such swearing," used in the instruction, plainly refer to "contending with angry words;" they could refer to nothing else; and as the evidence on which the instruction was based tended to show that the angry words employed by the prisoner were words of swearing, we do not think it can be properly said of this instruction that it assumes the fact of such swearing. The jury could not have been misled by this instruction. They had all the evidence be-

fore them; they knew to what evidence the instruction related; and the instruction could not, on this account, have been prejudicial to the defendant.  Swearing, or profane swearing, it is true, are not enumerated among the offenses for which a constable may, without a warrant or other process, make an arrest; but contending with angry words is, and contending with angry words of swearing is as certainly, covered by the statute; indeed, it may be safely said that words of swearing are most frequently employed in anger.  The statute, however, says "contend with angry words to the disturbance of the peace."  There was contention here, not only between Andy Ward and the defendant, but between the defendant, and Withrow, the officer, according to all the witnesses, except defendant himself.  The defendant ordered Ward with an oath to go on home and leave the woman; Ward demanded, as did the constable, that the defendant go about his business and leave them both alone; the defendant contended with both Ward and the constable that he would do neither and employed profane and angry words in doing so, bringing the case clearly within the provision of the statute, justifying the instruction given by the court.  The instruction assumes nothing however.  It simply told the jury that if they found the fact to be as stated therein that defendant was then guilty of an offense justifying his arrest.  Can there be any doubt that if the words attributed to him by the witnesses were employed by the defendant that they tended to a breach of the peace?  We think not.  The occurrence took place on a public road; the words used were well calculated to provoke a conflict and to bring about blows and the heat of passion.  It is said on the authority of 5 Cyc. 1025, that "Unless so provided by statute, abusive and insulting language will not constitute a breach of the peace, where there is no threat of, or incitement to, immediate violence."  But the same authority in the same connection says: "Where, however, it has a tendency to create a tumult and provoke a conflict, and especially when denounced by statute, the use of such language may constitute an offense, although the other elements mentioned are absent."  We think that in the language attributed to the defendant there was incitement to immediate violence, and that it

tended to provoke a conflict, consequently a breach of the peace within the very teeth of this authority. It will be noted that the words of our statute are "to the disturbance of the peace," not to a breach of the peace. The definition given in 5 Cyc. 1024 is, "The term 'breach of the peace' is generic and includes all violations of public peace, or order, or acts tending to the disturbance thereof," a definition broad enough to include the offense prescribed by our statute. We see no error in this instruction.

The next error of which the defendant complains is the refusal to give his instruction number five. This instruction is as follows: "The Court instructs the Jury that a Constable has no right under the law of this State to arrest or attempt to arrest any person without a warrant unless such person has committed a felony, or has committed some offense less than a felony in the presence or view of such Constable and the Jury is therefore instructed that such arrest, or attempted to arrest, would be illegal and unauthorized, and a person that a Constable in this State attempts to arrest without authority has the right to resist such arrest and to repel force with force, and if in so doing, it is necessary to kill the Constable, that such person would be justified and guilty of no crime." We think this instruction too broad, and calculated to mislead the jury. It is true as the instruction says that one has the right to resist an unlawful arrest and to repel force with force; but it is not the law, as we understand it, that one would be justified in taking the life of the officer, unless he believes himself to be in imminent danger, and that it is necessary to do so in order to save his own life or to save himself from some great bodily harm. Certainly it is not justifiable homicide for one to take the life of an officer under such circumstances for the sole purpose of gaining his liberty. As authority for this instruction we are cited to Wharton on Homicide, section 408, and some decisions referred to by him in note 3, at page 632. This writer does say that, "if the death of the person seeking to make the arrest results from the resistance by lawful measures, it is excusable homicide: and it has been held that, if necessary, rather than submit, he may lawfully kill the person seeking to arrest him." One of the cases cited, *Simmerman* v. *State*, 14 Neb. 568, does seem to have

41

so held, but we do not think the other cases cited hold as broadly as the author indicates. An examination of the other cases cited will show that the doctrine was stated on the theory of imminent danger and great bodily harm. Such, for example, seems to have been the case in *State* v. *Scheele*, (Conn.) 14 Am. St. Rep. 106, 112. In *Ross* v. *State*, (Tex.) 38 Am. Rep. 643, the killing of the officer was done after he had fired a pistol at one of the defendants. Bishop on Crim. Proc., section 162, says: "Where an attempted arrest is unlawful, the party may resist, but not to the taking of life. In general, if he does resist to this extent, his crime will be only manslaughter, yet there are circumstances in which it will be murder." Bishop on Crim. Law, section 868, says: "But the doctrine already stated that nothing short of an endeavor to destroy life or inflict great bodily harm will justify the taking of life, prevails in this case, so that if the person thus being unlawfully arrested kills the aggressor in resisting, he commits thereby the lower degree of felonious homicide called manslaughter. * * * * And the reason why a man may not oppose an attempt on his own liberty by the same extreme measures permissible in an attempt on his life, appears to be because liberty can be secured by a resort to the laws." In one of the cases cited in Wharton on Homicide, *Creighton* v. *Commonwealth*, (Ky.) 4 Am. St. Rep. 143, the first point of the syllabus is: "Person resisting attempted arrest by one acting without authority has the right to use only such force as is necessary to protect himself from assault, and has no right to take the life of the person attempting his arrest, unless it is necessary to save his own life or his person from great bodily harm." The same doctrine prevails in Virginia. *Muscoe* v. *Commonwealth*, 86 Va. 443; *Briggs* v. *Commonwealth*, 82 Va. 554. Our conclusion is that this instruction was rightfully refused.

What we have said in reference to the prisoner's fifth instruction will apply also to his twelfth instruction, which we think was also properly refused. This instruction was as follows: "The Court instructs the Jury that when one who is at a place where he has a right to be, is attacked by another, he need not retreat, but may repel force by force, and return blow for blow, and may without retreating kill his

assailant if the fierceness of the attack renders such killing necessary to free himself, or protect himself from death or great bodily harm." This instruction was inapplicable to the facts in this case except in a most general way.

Lastly it is assigned as error that the court modified the defendants- instructions numbered six, nineteen and twenty one, and gave them as the defendant's instructions, in violation of the provision of section 5, chapter 38, Acts 1907. This section is as follows: "All instructions shall be read before the argument to the jury in the following order, to-wit:—the instructions given by the court upon its own motion if any, shall be read first; those given upon the motion of the plaintiff shall be read second, and in any event before the instructions for the defendant are read; and those given upon the motion of the defendant shall be read last; no instruction shall be read twice, unless it is necessary to read them after being changed as provided in section 1 of this chapter, or upon special request by the jury." We do not understand counsel now rely on the objection, that the amendments of these instructions by the court, rendered them bad. We understand the only point presented by the brief is that having amended the instructions, the court in violation of the statute read them to the jury as the defendant's instructions. We think the amendments were properly made; that as proposed by the prisoner they were bad, and calculated to mislead the jury.

The sixth instruction is a re-statement in amplified terms of the rights of one in resisting an illegal arrest. The court struck out after the word "provided" these words "that he used no more force than was necessary or appeared to be necessary to him under all the circumstances surrounding the Defendant at the time," and in lieu thereof inserted "that the defendant had reason to believe and did believe that it was necessary to take such life in order to save his own life, or to protect himself from great bodily harm, at the time, or acted without malice."

The nineteenth instruction covers the same subject; but, in addition, introduces the subject of the superior size and strength of deceased, as compared with that of defendant, and of the defendant's supposed inability on account

of the superior size and strength of deceased to successfully cope with him and to prevent his arrest; and told the jury that, if the defendant in good faith believed that deceased was about to do him serious bodily injury, or to take his life, he had the right to resist his arrest in the manner stated. The court added by way of amendment to this instruction the proviso: "that the defendant in good faith believed that the deceased was able to do him serious bodily injury, or take his life." We see no prejudicial error in this.

The twenty first instruction related to the evidential weight the jury should give to the dying declaration of the deceased, and told the jury that they should "take into consideration that the prisoner was denied the right of cross-examination; *that said statement was not taken and made under the sanction of a judicial oath.*" The court struck out of this instruction the words in italics, and we think committed no error therein. We do not know what may have been implied by the term "judicial oath," unless it was that the deceased had not testified upon an oath administered to him in a court of justice. It appeared that the dying declaration was in fact sworn to, but this was not required. A dying declaration is competent evidence without having been made under oath, the solemnity of the occasion under which it is made being regarded as equivalent to an oath. We do not think therefore it was proper for the court to have discredited this declaration, in the minds of the jury, by the language of the instruction, as originally proposed.

But to return to the point relied upon, that the instructions, as modified, were given as the instructions of the defendant and not as instructions of the court. The attorney general contends that the statute of 1907 should be construed as directory and not mandatory. We cannot take this view of the statute. Unless construed as mandatory it would be meaningless; its evident purpose thwarted. The court would then be free to disregard its mandate. The statute amounts to a rule of practice, which the legislature is competent to prescribe, and whatever may be said of this class of legislation, we are not disposed to give it such construction as will deprive it of its efficacy.

But while the prisoner had the right to object to the modification of his instruction; and if modified to have them read as the court's instructions, and in the order directed by the statute, it was a right which we think he waived by failure to object and except at the proper time, and not having done so, it is too late for him to object and except thereto for the first time in this Court. It is argued that this objection was presented in the court below on the prisoner's motion for a new trial, after verdict; but it was then too late. The objection should have been made at the time the instructions were read; or about to be read, and before the jury retired.

Upon the whole case we perceive no error. The verdict may have been for a higher grade of crime than ought to have been found. The jury must have found that intent and malice were proven, without which their verdict would have been manslaughter. But we cannot say from the evidence that the verdict was not justified. The evidence shows the prisoner had armed himself with a deadly weapon, loaded it with balls, and had proceeded with a friend and companion in the direction in which Minnie Ward, and Andy Ward with whom he had had an altercation at the railroad station a few minutes before, had gone; evidently for the purpose of enticing her away from her father-in-law, Andy Ward. The preponderance of the evidence shows that when the officer interfered, the prisoner drew his pistol and began shooting at the officer; and although some of the shots may have been fired in the scuffle that ensued between him and the officer, who was endeavoring to arrest the pistol from the defendant, the jury no doubt believed that the shots were fired by the defendant with intent to kill, and malice in his heart. We therefore affirm the judgment below.

*Affirmed.*