STATE OF WEST VIRGINIA *v.* ARTHUR H. HOLMES

(No. 9342)

Submitted October 13, 1942. Decided November 24, 1942.

*Lee, Blessing & Steed,* for plaintiff in error.

*William S. Wysong,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

In the Intermediate Court of Kanawha County, Arthur H. Holmes was indicted and tried for the murder of one Ray Munson, a police officer of the city of Charleston, and found guilty of murder in the second degree. He prosecutes this writ of error to an order of the circuit court, refusing a writ of error to the judgment of the intermediate court entered upon the jury verdict.

Defendant was a duly qualified constable of Kanawha County. Upon two or three occasions he had assisted the sheriff's office in raiding the premises on West Washington Street where one Jack Kearns notoriously had engaged in the sale of intoxicating liquor. About twelve o'clock on the night of the homicide, he entered Kearns' place where, so he testified, he found a bar in full operation with intoxicating liquors on display. He bought and drank a small glass of gin and purchased, but did not drink, a second glass. He then called the sheriff's office on the telephone and, according to his testimony, requested that deputies be sent with a warrant. About the same time Kearns called the Charleston police department and reported that defendant was intoxicated and creating a disturbance. The evidence is conflicting as to whether defendant was in fact intoxicated and acting in a disorderly manner. Suffice to say there is sufficient evidence from which the jury could have drawn that inference.

In response to Kearn's call, deceased and another police officer, Williams, arrived in the vicinity of the Kearns' place in a cruiser car, and, seeing defendant standing on a street corner some distance away, left the car to arrest

him. Deceased went to get the cruiser car, leaving defendant in Williams' charge. Defendant then shoved Williams to one side and ran behind a nearby building. A short time later defendant returned to Washington Street in the same vicinity to get his automobile which was parked there. In the meantime the officers had obtained and returned with a warrant for defendant's arrest. The cruiser car drove up as defendant was walking along Washington Street, and, when it came opposite defendant, he again started to run and deceased jumped from the car, overtook him a short distance away and threw him to the sidewalk, where a struggle ensued. At this point it may be well to note that deceased was forty-seven years old, six feet one and a half inches tall and weighed one hundred ninety pounds; and defendant was thirty-three years old and weighed about one hundred thirty-five pounds. Theretofore the relations between the two men had been friendly.

Eyewitnesses testified variously as to the happenings immediately before the scuffle and during the course thereof. Defendant says that deceased overtook him, threw him to the ground face down, and struck him over the head a number of times with the butt of a revolver or some other hard object; that he succeeded in turning on his back, deceased continuing to strike him though he entreated him to desist; and, finally, fearing for his life, he succeeded in taking his gun from his coat and fired four shots, and that as the shots were being fired deceased, who was astraddle him, fell back exclaiming, "Oh, I'm shot."

Williams testified that at one time the men were fifteen or twenty feet apart; that all the shots were fired while they were still running; and that when he arrived at the place where the two men were struggling, deceased was striking defendant with the latter's revolver. Williams is corroborated by a witness, Hawkins, who heard four shots, ran to his porch and saw someone fall to the sidewalk. On the other hand, two defense witnesses, Elmer and Effie Facemeyer, support defendant's version of the fight. They testified that they saw deceased striking defendant, and

heard the latter plead for mercy, and that the shots were fired while defendant was on the ground with deceased on top of him. The record discloses that the shot which struck deceased entered his body in the left side at the mid-axillary line, an imaginary line drawn on the human body from the arm pit to the hip bone. The bullet entered deceased's body between the 11th and 12th ribs, was deflected downward, perforated his intestines, and as a result of peritonitis caused thereby Munson died the following day.

The record further discloses that deceased's revolver, which Williams testified he picked up from the ground where the two men were fighting, had in its chambers six undischarged cartridges, and that the defendant's gun had one empty chamber, one undischarged cartridge, and four discharged cartridges. The testimony of Sergeant Cobb, ballistics expert of the West Virginia Department of Public Safety, established beyond question that a bullet, identified as the one taken from deceased's body, was fired from defendant's gun. It follows that the jury, under this record, had the right to say, as it did when it rendered the verdict of second degree murder, that defendant killed the deceased.

The defendant was taken to police headquarters in the cruiser car driven by Hawkins, with Munson in the front seat and defendant in the rear in Williams' custody. When they arrived at the city building, defendant escorted by the police was taken into headquarters, and deceased was then taken to a hospital. There is some evidence in this record to the effect that after defendant entered headquarters and while he was being searched, he was unjustifiably struck twice by one of the police with his own cartridge belt loaded with cartridges. Be that as it may, from photographs contained in this record, taken shortly after his arrest, and from other evidence in this case, it is established beyond question that deceased inflicted blows on defendant's head which caused abrasions in his scalp and blood to flow profusely.

The record contains substantial evidence to the effect that the revolver belonging to Holmes showed blood-

stains when it was brought to police headquarters, which were on the weapon at the time it was exhibited to the jury at the trial, while the Munson revolver was free from any indication of bloodstains. This evidence, if true, corroborates Williams' testimony that when he reached the struggling men, Munson was using the Holmes' revolver in striking defendant. In such event, it necessarily follows that the jury could have inferred that Munson was shot before he used defendant's revolver to strike him.

When shot, Munson wore a double-breasted overcoat and a sweater. The sweater had a single hole, conforming to the place where the bullet entered deceased's body and around which were powder burns, on the basis of which Sergeant Cobb testified that the gun was not more than six inches away from deceased's body when the fatal shots were fired. There was no bullet hole in the overcoat at that place. Cobb's testimony rather strongly indicates that defendant's version to the effect that the fatal shot was fired while he was lying on the ground is true. On the other hand, though at one time the men were a number of feet apart, Munson overtook defendant, who then could have fired the fatal shot with the revolver close to Munson's body. This could have happened while the two men were still on their feet, and the other three shots might have been fired while they were still some distance apart. We think the jury had the right to find that the Holmes revolver was, in fact, used in striking defendant, and in so doing draw the inference that Munson was shot before Holmes was struck. In such event, it would follow that defendant shot, not through fear that the beating he was receiving placed him in danger of death or grave bodily harm, but in the act of resisting arrest. This, we think, was the inference which the jury drew when it rendered a verdict of second degree murder.

No presumption of malice arises by reason of the fact that Holmes was armed with a deadly weapon. Both men were officers of the law and as such were privileged to carry revolvers. If any malice is to be inferred, the inference must be drawn from the manner and circum-

stances in which defendant used his weapon. This Court has held that an officer legally armed with a revolver or other deadly weapon may unlawfully and so unjustifiably use it in killing a person that a jury may infer that the act was intentional and malicious and therefore constituted murder in the second degree. Thus in *State v. Bowles*, 117 W. Va. 217, 185 S. E. 205, this Court sustained a verdict of murder in the second degree against a defendant, who at the time of the homicide was a constable legally armed with a revolver, where the evidence was such that the jury could find, as it did, that the defendant's use of the weapon was without justification or provocation and resulted in an unlawful homicide. See also *State v. Gunter*, 123 W. Va. 569, 17 S. E. 2d 46; *State v. McMillion*, 104 W. Va. 1, 138 S. E. 732. Let us at this point apply these principles to the fact that the jury, in rendering the verdict of murder in the second degree, found that Holmes, in seeking to escape a lawful arrest, shot before Munson struck him. In this State, one has the right to resist an illegal arrest, but that right does not extend to the taking of the officer's life, "unless he has reason to believe and does believe he is in imminent danger, and that it is necessary to do so in order to save his own life, or to save himself from some great bodily harm". *State v. Clark*, 64 W. Va. 625, Pt. 17, syl., 63 S. E. 402, 403. *A fortiori*, the rule should be applied to a case in which the arrest, as here, is lawful. Munson was an officer of the law. He had the right to make arrests without warrant for misdemeanors committed in his presence. True, the first attempt to arrest Holmes was illegal, but on the second attempt Munson was armed with a warrant and clothed in his official uniform. If Holmes had any doubt as to the legality of the attempted arrest, he should have asked Munson to exhibit his warrant. See generally, 26 Am. Jur. 228. This he did not do. We therefore think that the evidence contained in this record, viewed in the light of these authorities, amply supports the verdict of murder in the second degree.

Error is assigned to the trial court's rulings in the giving of certain of the State's instructions and refusing cer-

tain instructions offered by defendant. We have considered the court's rulings in this regard, and fail to find the defendant was prejudiced thereby.

For the foregoing reasons, the judgment complained of is affirmed.

*Affirmed.*