UNITED STATES of America,
Plaintiff-Appellee,

v.

Mohan MANKANI, Kenneth R. Norris, Joseph Fortin, Peter Christopher MacFarlane, Sally Edith, Defendants-Appellants.

Nos. 878, 860–862 and 881, Dockets 83–1303, 83–1327, 83–1331, 83–1372 and 83–1374.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1984.

Decided June 20, 1984.

Arthur P. Anderson, Burlington, Vt. (Philip D. Saxer, Saxer, Anderson & Wolinsky, Burlington, Vt., of counsel), for defendant-appellant Mankani.

Nancy Gertner, Boston, Mass. (Judith H. Mizner, Silverglate, Gertner, Baker & Fine, Boston, Mass., of counsel), for defendants-appellants Norris and MacFarlane.

Jeffrey B. Meller, Burlington, Vt., for defendant-appellant Edith.

William K. Sessions III, Sessions, Keiner & Dumont, Middlebury, Vt., on brief for defendant-appellant Fortin.

Peter W. Hall, Asst. U.S. Atty., D.Vt, Rutland, Vt. (George W. F. Cook, U.S. Atty., D.Vt., Holly K. Harris and Sheila M. Ware, Asst. U.S. Attys., D.Vt., Rutland, Vt., of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and MANSFIELD and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal arises from charges leveled against nine persons as a result of a seizure of nearly two tons of hashish from a barn in an isolated, rural area of Vermont. All nine were charged by indictments filed in the United States District Court for the District of Vermont in late 1982 with conspiracy to import and export hashish in violation of 21 U.S.C. § 963 (Count 1) and conspiracy to distribute and to possess with intent to distribute more than 1,000 pounds of hashish in violation of 21 U.S.C. § 846 (Count 2). Four were charged with importation of hashish into the United States in violation of 21 U.S.C. §§ 952 and 960 (Count 3). Count 4 charged two individuals of this group with possessing over 1,000 pounds of hashish with intent to distribute it in violation of 21 U.S.C. § 841 and charged the seven others with aiding and abetting the two principals in violation of 18 U.S.C. § 2.

Five of those named in the indictments were tried and convicted and are before us on this appeal. Defendant Mankani was tried by a jury and the other four defendants had bench trials before the United States District Court for the District of Vermont (Coffrin, C.J.) on stipulated facts. Mohan Mankani was convicted on all four counts and received two concurrent 12 year terms, two concurrent five year terms and

20 years on special parole. Kenneth R. Norris, Joseph Fortin and Sally Edith each were convicted on Counts 2 (conspiracy) and 4 (aiding and abetting) and sentenced to two concurrent two year terms of imprisonment. Peter C. MacFarlane was found guilty on Counts 1, 2 and 4, sentenced to two concurrent 15 year terms and a concurrent five year term and fined $50,-000. Of the other four individuals charged, Gilles Stanton has never been brought before a court in the United States; William Sturgeon and Harold Raxlen were both convicted under Counts 2 and 4 and received a two and a half year and two year term respectively. Both filed but later withdrew their appeals. And, finally, Nizarali Hamirani pled guilty to Count 1 and was sentenced to 13 months in prison pursuant to a plea agreement under which he appeared as a government witness, and the remaining counts against him were dismissed.

## I Facts

We recite generally some of the factual background, leaving until later the specific details to be sketched in where appropriate to the discussion. During the spring and summer of 1982 the Royal Canadian Mounted Police (RCMP) suspected that MacFarlane and Stanton, both Canadians, were planning to import hashish into Canada. The RCMP obtained court orders permitting it to intercept these two suspects' telephone calls in order to obtain further information. During the late summer of 1982 nearly two tons of hashish arrived at Houston, Texas from Bombay, India in three separate shipments. It was concealed in eight—seven foot long—hefty and nearly impregnable steel cylinders, weighing 500 pounds apiece. After clearing Customs the three shipments were combined and flown by Flying Tiger Lines to John F. Kennedy International Airport in New York where a number of people, including some of these defendants, had been waiting for them to arrive. On Wednesday September 8, following the Labor Day weekend, the eight cylinders were picked up at a warehouse by defendant MacFar-

lane, who had rented a forklift to load the cylinders on a rented truck. MacFarlane then took the cylinders by truck to Bakersfield, Vermont. His destination was a small farm with a house and barn. Defendants Fortin and Edith leased and occupied the first two floors of the house. Fortin also rented a portion of the barn.

MacFarlane arrived late Wednesday night at the Bakersfield farm with the cylinder-laden truck. Opening the cylinders and extracting the hashish proved to be a formidable task, despite the use of various pieces of equipment that Fortin had rented to assist in the operation. Defendants Norris and Raxlen had also purchased a hydraulic press and ram for repackaging the hashish after it was removed from the cylinders.

On Friday September 10 defendants Mankani and Hamirani flew from New York, where they had been waiting with MacFarlane for the hashish to arrive from Texas, to Burlington, Vermont and checked into a local hotel. They were assigned Room 128. Mankani made a telephone call to Stanton in Montreal that was intercepted by the RCMP who immediately notified the United States Drug Enforcement Administration (DEA) and Vermont State Police. DEA Agent Handoga went to the hotel and commenced aural surveillance of Room 128. He was able to do this by taking the adjoining room and placing his ear against a pre-existing hole in the wall between the two rooms. The hole was the result of a change the hotel had previously made in its room telephone service. Its visibility from the room rented by Mankani and Hamirani was blocked by a nightstand, except for approximately two hours on Monday night, September 13, when Mankani moved the stand. That same night, MacFarlane joined Mankani and Hamirani and the three of them had an extended conversation that lasted until 2:30 a.m. the following morning. Agent Handoga overheard most of this conversation.

While MacFarlane was talking in Room 128, another DEA agent found MacFar-

lane's car in the parking lot and put a beeper on it so that when MacFarlane left the hotel later, he was tailed by a car full of police officers and kept under observation by police helicopter. When MacFarlane arrived at the Bakersfield farm, the police were close behind him. There, they took up positions of surveillance at several points from which they could observe the house and the barn. Although they could view some of the activities that took place inside the house, the officers could not see into the barn since the barn's windows were covered.

Some of the police involved in this investigation later met with and briefed DEA Agent Rabourn, the agent in charge. Based upon the information given him by these agents, Rabourn completed an affidavit for a search warrant seeking authorization for the officers to search the house and barn at Bakersfield for hashish, proceeds, tools, invoice records and other documentary evidence of an illegal drug operation. Having obtained the warrant, Rabourn and his men executed it on Tuesday September 14, at which time they seized all evidence and arrested Raxlen, Edith, Norris, MacFarlane and Sturgeon. Mankani was apprehended later at the hotel, and Fortin submitted himself to the court's jurisdiction in response to a summons.

The five defendants raised several issues. Only three warrant discussion: whether the aural intrusion of the DEA agent into the hotel room where defendants MacFarlane and Mankani discussed the crime violated these defendants' Fourth Amendment right to privacy; whether there was probable cause to support the issuance of this search warrant; and, whether defendant Edith's guilt was proven beyond a reasonable doubt.

## II  *Whether Eavesdropping Violated Fourth Amendment*

The most troublesome issue on this appeal is the one raised by defendants Mankani and MacFarlane. It questions the constitutionality of Agent Handoga's eavesdropping on their conversation in the Burlington hotel by putting his naked ear against a hole in the wall between his room (130) and defendants' room (128). Concededly, a search warrant was not obtained for this intrusion. Whether overhearing this conversation constituted an unlawful search or seizure in violation of Fourth Amendment rights depends on whether these defendants under the circumstances had *a reasonable expectation of privacy*. If MacFarlane and Mankani had a reasonable expectation of privacy in their conversation in the Sheraton Hotel room, then the warrantless "seizure" of that conversation violated the Fourth Amendment. If not, the district court, after conducting a hearing on this issue, properly denied their motion to suppress the conversation.

Analysis must begin with *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which established the expectation of privacy rationale as the touchstone governing the scope of Fourth Amendment protection. In that case government agents eavesdropped on conversations in a telephone booth by means of an electronic listening device attached to the top of the booth. Discarding the notion that a physical trespass is essential to any Fourth Amendment violation, the Supreme Court found the intrusion in *Katz* to be unconstitutional. Thus, *Katz* teaches that "the Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. at 511.

Of course, the fact that people are protected does not mean that place has no bearing on one's reasonable expectation of privacy. Plainly it does. Those who claim their privacy has been unlawfully invaded do not live in a vacuum. As Justice Harlan observed in his concurring opinion in *Katz*, the answer to the question of what protection is afforded to those "people ... requires reference to a 'place.'" *Id.* at 361, 88 S.Ct. at 516.

This court has recognized the importance of "place" as one of the factors to be considered in evaluating the constitutionality of a search and seizure. In *United States v. Agapito*, 620 F.2d 324 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), for example, we ad-

dressed the question of whether government agents violated the Fourth Amendment when they eavesdropped on defendants' hotel room conversations by pressing their ears to the connecting door of an adjacent room. *Agapito* first cited Justice Harlan's two part test for determining whether a Fourth Amendment search and seizure occurred: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. at 516. We then proceeded to examine the reasonableness of the expectation in light of several factors, including where the eavesdropping took place, whether the agents had a legal right to be situated in the adjoining hotel room and whether they were aided by any artificial, mechanical or electronic devices. *United States v. Agapito, supra,* 620 F.2d at 330–32. After a thorough analysis, we concluded that the agents in *Agapito* did not violate the Fourth Amendment.

■ Since the instant case is factually similar to *Agapito*—at least with respect to the Fourth Amendment claim—we begin with an analysis of the same factors, though not in the same order. First, of critical concern in deciding whether a reasonable right to privacy exists, is the type of surveillance employed. For example, a phone tap in a public telephone booth, bug in a hotel room, detectorscope or other sensitive electronic listening device requires a court order issued by a neutral magistrate. *See* Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510, *et seq* (1982). Here, defendants' conversations were overheard by the naked human ear, unaided by any of these sensory enhancing devices. This distinction is significant because the Fourth Amendment protects conversations that cannot be heard except by means of artificial enhancement. 1 W. LaFave, *Search and Seizure* § 2.2, at 270–72 (1978) (LaFave). The reason for this is evident. The risk of being overheard is a given in modern life, and any time people speak to one another they necessarily assume that risk.

*Hoffa v. United States,* 385 U.S. 293, 303, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). "But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy." *Lopez v. United States,* 373 U.S. 427, 465–66, 83 S.Ct. 1381, 1401–02, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting). Absent a warrant, this kind of investigative intrusion bypasses the safeguards of a neutral magistrate's predetermination of probable cause. Rarely does such an intrusion earn judicial approval, regardless of the place where a person happens to be when it occurs—home, hotel room, office or glass-enclosed public telephone booth.

■ The next factor is whether the agents had a legal right to be in the adjoining room and, if so, whether the defendants could reasonably have anticipated the agents' right to be there. In analyzing this factor the location of Agent Handoga, with his ear pressed to the hole in the wall, must be carefully scrutinized. Just as what an officer sees when lawfully present is considered nonintrusive plain view, what he hears while so stationed is similarly not a search and seizure and is thus *per se* lawful. *LaFave* § 2.2, at 245. So, were the intercept in *Katz* made by a police officer standing in a public queue to use the same telephone—where he would have had a right to be—it would be considered good police work. In the case at bar, there is no doubt that the government agents had a right to carry on their investigation from the adjoining room. Moreover, *Agapito* held that an agent could lawfully stand with his ear pressed against a wall and that such presence may be reasonably anticipated by defendants. *See also United States v. Ortega,* 471 F.2d 1350 (2d Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973).

■ Defendants argue that this case can be distinguished from *Agapito* because here the agents listened through a hole in the base of the adjoining wall. The record

reveals that the presence of the hole was entirely fortuitous, and the agents took no part in creating or enlarging it. This is not to say that the absence of a physical trespass or intrusion is controlling. *Katz* prohibits such analysis. Yet the trespass factor's continued viability as part of a larger framework, *see Rakas v. Illinois,* 439 U.S. 128, 143–44 n.12, 99 S.Ct. 421, 430–31 n.12, 58 L.Ed.2d 387 (1978), is relevant when considering whether the individual's expectation of privacy is justifiable under the circumstances. *See United States v. Knotts,* 476 U.S. 276, 103 S.Ct. 1081, 1083, 75 L.Ed.2d 55 (1983). Absent some physical intrusion, there is no substantial basis for distinguishing this case from the case where an agent presses his ear against a paper thin wall, an adjoining door, *United States v. Agapito, supra,* or a keyhole, *see United States v. Ortega, supra,* 471 F.2d at 1361. *See also United States v. Llanes,* 398 F.2d 880 (2d Cir.1968), *cert. denied,* 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969).

Turning finally to the place where the eavesdropping took place, we acknowledge that the occupants of a hotel room are entitled to Fourth Amendment protection. *See Hoffa v. United States, supra,* 385 U.S. at 301, 87 S.Ct. at 413. A guest in a hotel room, like the occupant of a room in a boarding house or of an apartment or house, has the same constitutional rights against unreasonable searches and seizures. *See Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). Thus, it is not the common hallway, entryway or passage alone that diminishes one's reasonable expectation of privacy in a hotel or motel room. Instead, it is the fact that hotels, as opposed to residences, are truly transitory places. *United States v. Jackson,* 588 F.2d 1046, 1052 (5th Cir.1978), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979) (citing *Marullo v. United States,* 328 F.2d 361, 363 (5th Cir. 1964)). Unlike an apartment or a room in a boarding house, hotels and motels are not ordinarily considered places where one lives and keeps personal effects. In addition, service personnel in hotels and motels have keys to enter and make-up the rooms, remove dishes, check air-conditioning, heating and the like. Former occupants may even have retained a key to a hotel room. Indeed, the presence of a visible door, crack or opening in a wall adjacent to another hotel room, as was the case here, should suggest to the average person that his or her privacy may be limited.

In short, it is the transitory nature of such places, commonly understood as such, that diminishes a person's justifiable expectation of privacy in them. Since a hotel room is exposed to others, it is unlike a "house," *i.e.,* a place where one lives. Therefore, there is an accepted loss of privacy when one occupies a public place, somewhat akin to a conversation in the street, and the intervention of a human ear in those surroundings is the kind of intrusion one should anticipate. A number of courts, including our own, have concluded that the intrusion of a human ear in similar circumstances is not an unlawful "seizure" of a conversation in a hotel or motel room. *See, e.g., United States v. Agapito, supra; United States v. Sin Nagh Fong,* 490 F.2d 527, 530 (9th Cir.), *cert. denied,* 417 U.S. 916, 94 S.Ct. 2618, 41 L.Ed.2d 220 (1974); *United States v. Ortega, supra; Ponce v. Craven,* 409 F.2d 621, 625 (9th Cir. 1969).

We conclude from the foregoing analysis that in order for the government to prove the constitutionality of its intrusion against an individual's claim of a violation of a reasonable expectation of privacy, it must demonstrate that: (1) the place where the intrusion occurred is one where the individual did not have a justified expectation of privacy; (2) the intrusion was not aided by mechanical or electronic means; and (3) the investigating officer was situated where an individual should anticipate that another person might have a right to be. Here defendants Mankani and MacFarlane were in a Sheraton hotel room with a diminished expectation of privacy when their conversation was overheard by Agent Handoga listening with his ear pressed against an aperture from an

adjoining room where the officer had a legal right to be. No physical, mechanical or electronic aids were used. Hence, the government has met its burden of justifying this intrusion and did not violate these defendants' Fourth Amendment rights.

### III  *The Search Warrant and Suppression of Evidence Found in the Barn*

The next issue addressed is whether Judge Coffrin erred in failing to suppress the evidence seized by the government when it searched the Bakersfield house and barn. This encompasses two sub-issues: first, whether the facts presented to the issuing magistrate established probable cause when the officers applying for the warrant—so defendants claim—intentionally or recklessly omitted information that might have negated probable cause; and, second, whether the warrant was vague and overly broad requiring suppression of the papers, receipts and invoices seized from the barn.

■■■ As a threshold matter, it is necessary to resolve the "standing" issue—*i.e.,* whether those challenging the warrant have cleared the initial hurdle of showing a legitimate expectation of privacy in the place searched. Mankani, for example, recognizes his lack of standing; the government, on the other hand, concedes that Fortin, who lived at the Bakersfield house and rented a portion of the barn, has standing. We focus our inquiry, therefore, on MacFarlane and Norris and agree with Judge Coffrin's observation that these two defendants might have standing to challenge a search of the rooms they occupied in the house. Nevertheless, their standing does not extend to the barn where the seizures took place since they neither "resided" in the barn, nor kept any personal effects there. *See, e.g., Rakas v. Illinois, supra.* Their only connection with the barn involved periodic visits. Thus, the total circumstances support the trial court's view that MacFarlane and Norris did not have a reasonable expectation of privacy in the barn, and, consequently, lack the necessary standing to challenge the seizure of contraband and evidence from it. We turn to the challenges to the search warrant raised by Fortin who does have standing.

### A.  *Probable Cause*

Defendants' argument is really not so much that the moving papers presented to the issuing magistrate failed to establish probable cause, but rather that Agent Rabourn's affidavit, which served as a factual predicate for the search warrant, was replete with misrepresentations and/or material omissions of fact. These misrepresentations and omissions allegedly concern the multiple hearsay nature of the information obtained through the Canadian wiretaps, the rental and use of another cottage in Stowe, Vermont, observations by the agents in Bakersfield and MacFarlane's prior criminal record.

■■■ In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court permitted a challenge to the veracity of a search warrant affidavit. To mount such a challenge successfully, one must show that the false statements and omissions were made intentionally, knowingly or with reckless disregard for the truth. Once this is established by a preponderance of the evidence, the trial court must separate and set aside any false material and determine if the remaining facts show probable cause. *Id.* at 156, 98 S.Ct. at 2676. The first claimed falsehood in the affidavit refers to MacFarlane as the lessor of a cottage in Stowe, which was surveilled by the agents. This is hardly relevant to the issue of probable cause, particularly since the Stowe cottage was rented in the name of another defendant, not MacFarlane. Similarly, the misstatement as to the disposition of prior drug charges against MacFarlane is irrelevant.

■■■ More troubling is the allegation of misstatements and omissions regarding information relayed to the testifying DEA agent by a RCMP officer. It appears from the transcript of the wiretap recordings that the agent substantially overstated the

evidence. For example, the hearsay included conclusory statements that MacFarlane and another were arranging an illegal importation of hashish. Misstatements in affidavits are a serious matter since, unless they are controlled, an agent can effectively circumvent the probable cause requirement by the simple expedient of exaggeration. But in this case defendants' arguments strike us as somewhat trumped-up. The affidavit of DEA agent Rabourn makes clear that he obtained his information from the RCMP, and it is also clear from the nature of the statements that they are conclusory in form. Moreover, there is no direct evidence that omissions, if any, were intentionally or recklessly made. Plainly the agents did "pick and choose" what to include and what to omit; for example, they omitted from the affidavit the fact that a field test on a substance found at the house in Stowe was negative. Yet even had the magistrate been so advised, he still would have been justified in issuing the warrant.

### B.  Overbreadth of Warrant

■ Defendants contend that the warrant was overbroad in allowing the agents to seize all invoices and records that had any relation to the 21 U.S.C. §§ 841, 846 violations. While arguably the warrant treads a bit close to being a "general warrant"—impermissible because it gives the search party virtually unfettered discretion to seize anything they see, *see, e.g., Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (search warrant authorizing seizure of books, records, pamphlets, receipts, records, etc. that deal with the alleged crime was held to be overbroad)— the Supreme Court in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), upheld a warrant that referred to documents pertaining to a specific fraudulent transaction and a specific piece of real estate. All the evidence permitted under the warrant to be seized in the instant case pertained to the importation and distribution of hashish. Because of its specificity, we cannot find that it was overbroad. Hence, the attack on the

search warrant was properly rejected by the court below.

### IV  *Sufficiency of Evidence Against Edith*

■ Finally, defendant Sally Edith has urged that the evidence against her was insufficient as a matter of law to sustain her conviction. To determine whether a reasonable trier of fact could have convicted this defendant, *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Before admitting a co-conspirator's statement into evidence against Edith—here the conversation between MacFarlane and Mankani in the hotel room—it is required under *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), that the non-hearsay testimony demonstrate by a fair preponderance of the evidence Edith's participation in the conspiracy.

■ The government introduced eight pieces of non-hearsay "evidence" against her. We recite and analyze each of them in turn. First, Sally Edith was one of two persons renting the Bakersfield house. This is hardly relevant absent evidence of any criminal activity in the house. All such activity took place in the barn, which was leased separately to Joseph Fortin, and the evidence proffered at trial shows that Edith never entered the barn. Second, Edith lived in the farmhouse with co-defendant Fortin. In order to give this fact weight, it would be necessary to adopt something close to the concept of guilt by association. There is no evidence that Edith conversed with Fortin about the criminal venture or knew of Fortin's involvement. Third, Edith was absent from her job the day after the hashish arrived at the barn. The government fails to explain why this absence from work might create an inference of involvement in a conspir-

acy, especially since there is no showing that Edith engaged in any wrongdoing on that day. Moreover, Edith did attend work on five or six of the seven or eight days the hashish was being processed in the barn, a fact negating the implication that she missed work to assist in the crime. Fourth, the same day Edith missed work, defendant Fortin purchased equipment to open the cylinders. Yet, again there was no evidence that she accompanied him or knew of his purchase or its purpose. Fifth, the agents staking out the Bakersfield farm saw Edith inside the house. Since it is already conceded that as a tenant she lived in the house, this piece of "evidence" is irrelevant. Sixth, there was machinery noise and activity going on in the barn that Edith must have noticed. Again, there was no evidence that she knew what was going on in the barn and, as noted, all the evidence points to the fact that Edith completely disassociated herself from the barn. On this point the government argues that the defendant must at least be guilty of "conscious avoidance." This argument is totally illogical. How can a person consciously *avoid* participating in a conspiracy and also be a member of the conspiracy? The two notions are obviously mutually exclusive.[1] Seventh, prior to the government's raid, Edith walked from the house, past the barn to the mailbox and back. This is not evidence of anything other than how Edith retrieved her mail. Eighth, Edith came out later in her swimsuit and went to a nearby pond for a swim. When she got out, she was intercepted by the police on a path that led back to the house and barn. As with the "fourth" and "seventh" facts above, this is simply not evidence of participation in a conspiracy, ab-

sent any indicia that would characterize a lookout, *e.g.*, her attempt to warn those in the barn of the approach of the agents. Nothing of that sort was shown. Thus, Edith's actions are at least as consistent with innocence as with guilt.

■ We cannot conclude therefore that the totality of these eight "pieces of evidence" leads to any fair inference implicating Edith in the conspiracy. Some have nothing to do with her or are explanations of human activity without criminal connotation; the rest are largely irrelevant. Perhaps Sally Edith was involved in this conspiracy, but, based on the non-hearsay evidence proferred by the government, for the district court so to conclude was sheer speculation.

■ With respect to the aiding and abetting charge against Edith, a statement is not hearsay under Fed.R.Evid. 801(d)(2)(E) if offered against a party and made by a coconspirator of that party during the course and in furtherance of the conspiracy. However, since the government failed to prove Edith was a coconspirator, the comments by MacFarlane and Mankani in the hotel room are inadmissible hearsay. Without those statements, there is insufficient evidence to find Edith guilty of aiding and abetting the other defendants. Thus, this charge must also be reversed and both counts of the indictment against Sally Edith dismissed.

Accordingly, the judgments of conviction of Mankani, MacFarlane, Norris and Fortin are affirmed and that of Edith is reversed and the indictment against her dismissed.

---

**1.** As this Court has recognized on numerous occasions, application of the "conscious avoidance" theory is appropriate where the essential mental element of the crime is "guilty knowledge." *See, e.g., United States v. Jacobs,* 475 F.2d 270, 287–88 (2d Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); *United States v. Squires,* 440 F.2d 859, 863–64 (2d Cir. 1971). *See also United States v. Jewell,* 532 F.2d 697, 699–703 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). It is equally clear that the requisite mental state for

conspiracy is intent, not mere knowledge. *United States v. Soto,* 716 F.2d 989, 991 (2d Cir. 1983); W. LaFave & A. Scott, *Handbook on Criminal Law* § 61, at 464–66 (1972). Thus, the error in the government's logic becomes obvious. If someone can consciously avoid learning of the activities and objects of a conspiracy, how can that person ever intend those events to take place? Similarly, if the person can consciously avoid learning about a secret agreement, how then can she manifest an intent to join that agreement?