383 S.E.2d 286

**William Anthony WAGNER**

v.

**Jerry C. HEDRICK, Warden, West Virginia Penitentiary.**

No. 18478.

Supreme Court of Appeals of West Virginia.

April 18, 1989.

Rehearing Denied July 20, 1989.

Dissenting Opinion Aug. 2, 1989.

Jane Moran, Williamson, for William Anthony Wagner.

Charles G. Brown, III, Atty. Gen., Charleston, for Jerry C. Hedrick.

BROTHERTON, Chief Justice:

The petitioner, William Anthony Wagner, was convicted of first degree felony murder by a Mingo County Circuit Court jury on January 8, 1983. He was sentenced to life imprisonment with a recommendation of mercy. Wagner now assigns as error (1) the admission of evidence discovered during a warrantless search of his clothing while he was being treated in a hospital emergency room, and (2) the admission of testimony regarding a letter allegedly written by him without requiring the production of the actual letter.[1] We find no reversible error and affirm Wagner's conviction for the reasons set forth below.

I.

The body of Dwight Truman Elswick was found in the early morning hours of July 21, 1982, at his work site, a Norfolk and Western shack adjacent to the railroad tracks in Williamson, West Virginia. Coworkers were first alerted to his circumstances when an unidentified plea, "Somebody come to me," was transmitted over the railroad yard's radio system at 12:57 a.m. Elswick's body was discovered minutes later, lying face down on the floor of the shack, with the radio microphone near his hand and his back pants pockets turned inside out. Subsequent investigation revealed that Elswick was killed by a shot from a .38 caliber revolver and that he was robbed of a substantial amount of money and a 1903 ten dollar gold piece. There were no witnesses to his killing and no evidence was found at the scene that indicated the identity of Elswick's assailant.

Later that day, at approximately 9:24 p.m., the petitioner, William Anthony Wagner, and his traveling companion, Chatwan Smith, were involved in a motorcycle accident in Logan, West Virginia. State Police Trooper S.M. Pinion arrived at the scene at 9:40 p.m. He secured the accident victims' personal effects—consisting of two duffle bags and motorcycle helmets—by putting them in the trunk of his cruiser. Pinion stated that he did not look through the duffle bags, but kept them solely for the purpose of "safekeeping." A wrecker was also called to the accident scene and arrived at approximately 10:15 p.m. After helping to load the motorcycle onto the back of this wrecker/pick-up truck, Pinion went to Logan General Hospital in order to complete an accident report and check on the condition of the victims.

According to Trooper Pinion's testimony, he arrived at the hospital to find an extremely chaotic emergency room which was packed with people. Wagner was in a bed in the emergency room, apparently conscious but also intoxicated and in extreme pain. Smith was in a nearby bed, but they were separated by a curtain between them. Dr. Patricia Lewis, the emergency room physician who treated Wagner that night, testified that he suffered a compressed fracture of the spine and also had a fractured clavicle. She indicated that he was lethargic and in a great deal of pain, and that his blood alcohol level was .170. Chatwan Smith sustained fractured ribs in the accident and the doctor indicated that she was also "incapacitated."

Pinion attempted to identify the victims in order to complete his accident report, asking those present, in general, "Does anybody have any identification?" He stated that he looked for a hospital admissions sheet but could not find one. Joyce Dean, a supervisor at Logan General Hospital, testified at the suppression hearing that at approximately 10:25 p.m., Wagner provided her with information she needed to fill out the emergency room record, which she said should have been on a desk in the emergency room. Dean said that Wagner seemed to be coherent, but that when she wrote down the admissions data she put a question mark by his name be-

---

1. A third issue assigned as error, involving the application of the recidivist statute, has been resolved. The State has stipulated that the statute was incorrectly applied to Wagner's sen-tence and thus, as a result of the jury's recommendation of mercy, he is eligible for parole after serving ten years of his life sentence.

cause he appeared uncertain or hesitant about giving it to her. Pinion testified that he directed questions to Wagner, but concluded that Wagner either couldn't answer questions or didn't want to answer questions because of the pain he was in.

Wagner's clothing had been removed and placed in a basket underneath his bed. Pinion removed the pants and looked in the pockets for I.D., but found only dollar bills, some change, and a gold coin. Attaching no particular significance to the gold coin, he put everything back into the basket. A few minutes later, a nurse handed him Wagner's drivers license. Pinion became suspicious upon seeing an Ohio drivers license, as he recalled that the motorcycle had cardboard tags on it indicating that its Rhode Island tags had been stolen. Pinion proceeded to call the State Police office in Logan, and he asked that an NCIC check be run on "William A. Wagner." At this point, Dispatcher Buzz Keesee informed Pinion that the Williamson city police had issued an APB for an "Anthony Wagner" at around 9:00 p.m. and that he was wanted in connection with the robbery and murder of a railroad worker in Williamson. Pinion asked for more details and awaited a phone call from someone who could provide additional information.

Concerned that Wagner might have a gun, Pinion informed a doctor that two people being treated in the emergency room may have been involved in a robbery and murder in Williamson. Pinion was told that the woman, Chatwan Smith, had a roll of money she wouldn't let loose of, even though a nurse had tried to secure it. Pinion told a doctor they had better attempt to get the money because it may be connected with the robbery. A doctor finally took the money from Ms. Smith and handed it to Pinion, who counted $2,750.00 in hundreds and fifties.

A few minutes later, Pinion received a phone call from Corporal B.L. Baker, who was in Williamson and who filled Pinion in on the details of Elswick's death and Wagner's possible connection to the crime. The police believed it was Wagner who had bought a motorcycle earlier that day from Trooper John Zirkle, who was off duty and not in uniform, paying him $1,500.00 in one hundred dollar bills for it. Police suspected that Wagner had robbed Elswick of between $5,000.00 and $7,000.00, as well as a gold coin. Pinion then told Baker that he had observed a ten dollar gold piece in Wagner's pants pocket when he was looking for I.D. Both Baker and Pinion considered Wagner to be a suspect at this point. Baker told Pinion to secure the gold coin and the money and that he (Baker) would be over to the hospital the next day. They discussed obtaining a search warrant but concluded that because Pinion was the only police personnel at the hospital at such a late hour and because Pinion was unaware of the extent of Wagner's injuries and was afraid he might attempt to dispose of the coin, taking the coin without a warrant was the "practical thing to do under the circumstances."

After his conversation with Corporal Baker, Pinion felt that he had probable cause to arrest Wagner, indicating that "if he had tried to get up, I would have detained him." He subsequently removed the contents of Wagner's pants pockets. Pinion told hospital personnel to keep Wagner in a secured room that night. The two duffle bags, helmets, and other personal effects belonging to Wagner and Chatwan Smith were placed in a plastic bag and locked in the evidence room at the state police barracks in Logan that night.

At 3:50 p.m. on July 22, 1982, Corporal Baker applied to Magistrate Johnny Mendez for a warrant to search the duffle bags. The warrant indicated that the police were looking for a wallet, money, identification cards, or papers belonging to Dwight T. Elswick and a .38 caliber revolver that may have killed him. As grounds for probable cause for issuance of a warrant, the warrant stated "that the bags listed are the property of William A. Wagner and may contain property stolen of Dwight T. Elswick and may contain evidence of the crime due to the oral statement from Trooper S.M. Pinion that William A. Wagner had in his possession a gold coin belonging to Dwight Elswick."

Upon obtaining the search warrant, Trooper Pinion unlocked the evidence room for Corporal Baker and turned over the money retrieved from Chatwan Smith as well as the gold coin—a 1903 series ten dollar gold piece—which had been placed in an envelope and remained in Pinion's possession until he turned it over to Baker. In the duffle bag Baker found a .38 caliber revolver with six cartridges in the cylinder of the weapon. Later that evening, at around nine or ten o'clock, Wagner was officially placed under arrest and informed of his *Miranda* rights.[2]

Prior to trial, an extensive suppression hearing was held at which Trooper Pinion, Corporal Baker, the defendant Wagner, Chatwan Smith, and ten hospital employees testified as to the events occurring in the Logan General Hospital emergency room on July 21, 1982. After hearing the arguments of counsel, the court ruled on various motions, including the defendant's motion to suppress the gold coin and all evidence obtained as a result of the gold coin. The court stated that the first search of the defendant's pockets presented the real issue to be addressed as the subsequent seizure of the coin occurred after Trooper Pinion had probable cause to arrest the defendant, based upon the information received from Corporal Baker, the fact that an A.P.B. had already been issued for Wagner, and the money that was taken from Chatwan Smith.

Noting the police officer's duty to preserve an accident victim's property and notify any next-of-kin of the accident, depending upon the extent of the injuries, the court denied the defendant's motion to suppress. The court found that Trooper Pinion was not engaging in a search for evidence of criminal activity, but was simply attempting to ascertain the identity of a person involved in a motor vehicle accident, as he is required to do by statute.[3] Thus "[h]e did not seize this coin and he was not in the process of making any kind of search as is contemplated by the United States Constitution or the West Virginia Constitution." The court concluded that the initial warrantless search of the defendant's pants pockets for identification did not unreasonably interfere with Wagner's property interests and, therefore, "the officer's behavior was reasonable under the circumstances, and did not violate the Fourth Amendment."

## II.

Wagner now argues that the trial court violated his Fourth Amendment right to be free from unreasonable searches and seizures when Trooper Pinion invaded his reasonable expectation of privacy by searching the basket of clothes underneath his hospital bed without first attempting to determine his identity through other available sources. Wagner argues that because the initial warrantless search produced the gold coin which provided probable cause to support the subsequent warrant to search his duffle bags, all evidence obtained as a result of the first illegal search should be excluded as "fruits of the poisonous tree."[4]

■ Both "[t]he Fourth Amendment of the *United States Constitution* and Article III, Section 6 of the *West Virginia*

---

**2.** However, oral statements subsequently made by Wagner to Corporal Baker were later suppressed as the trial judge found that the State failed to meet its burden of demonstrating by a preponderance of the evidence that Wagner was properly advised of his constitutional rights.

**3.** West Virginia Code § 17C–4–7 (1986) requires written reports of accidents occurring on the public highways of this State which result in bodily injury to or death of any persons or total property damage to an apparent extent of two hundred fifty dollars or more. Section 17C–4–7(c) provides, in relevant part, that:

Every law-enforcement officer who, in the regular course of duty, investigates a motor vehicle accident of which report must be made as required in this section, either at the time of and at the scene of the accident or thereafter by interviewing participants or witnesses shall, within twenty-four hours after completing such investigation, forward a written report of such accident to the department. . . .

**4.** *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939).

*Constitution*[5] protect an individual's reasonable expectation of privacy." Syllabus point 7, *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981). A claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon a person's property right in the invaded place or article of personal property, but upon whether the person has a legitimate expectation of privacy in the invaded place or thing. *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967).[6] If a person is in such a position that he cannot reasonably expect privacy, a court may find that an unreasonable Fourth Amendment search has not taken place.

While the word "search" is capable of many definitions, the United States Supreme Court has stated that "a search ordinarily implies an intrusive 'quest by an officer of the law.'" J.W. Hall, *Search and Seizure* § 1:6 (1982). However, "when there is no intrusion on an expectation of privacy, there is no search." *Id.*

■ The first issue before us, then, is whether William Anthony Wagner main-tained a reasonable expectation of privacy in the contents of his pants pockets once he was brought into the emergency room of Logan General Hospital. Given the facts evident from the record, we cannot find that Wagner could have exhibited a reasonable expectation of privacy in his personal effects in this hospital emergency room on this particular night. Rather, we believe Wagner's expectation of privacy was necessarily diminished by the circumstances under which he was brought into the hospital. Any expectation of privacy which Wagner may have had could not be termed "reasonable" because he was in a hospital emergency room, one which many people had access to and in which many people, particularly medical personnel, were constantly moving around. The area was freely accessible to law enforcement officers, and Trooper Pinion had a right to be there that night by virtue of his duty to investigate this particular accident. It is apparent that Wagner had very little control over what happened in the emergency room area and that he and his personal effects could be placed wherever the hospital staff chose to put them.[7]

5. The Fourth Amendment to the United States Constitution states that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Parallel language is found in Article III, Section 6 of the West Virginia Constitution.

6. Justice Harlan discussed the "reasonable expectation of privacy" test in his concurring opinion in *Katz,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587–88, in which he stated, "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"

7. *See Sullivan v. District Court of New Hampshire,* 384 Mass. 736, 429 N.E.2d 335 (1981), in which the court found that a nurse could not have had a reasonable expectation of privacy after leaving his jacket in the hospital canteen, a common area open to all hospital employees. *Id.* 429 N.E.2d at 338–39. The jacket was dis-covered by a special police officer at the hospital, who saw a pouch in one of the jacket pockets containing "a green substance" which he "assumed to be marijuana." *Id.* at 337.

The *Sullivan* court held that there was no "search" in the Fourth Amendment sense because "[a] person cannot claim to have been the victim of a search violative of the Fourth Amendment unless he had a legitimate expectation of privacy in the particular circumstances." *Id.* at 338 (citations omitted). Noting the Supreme Court's statement in *Katz v. United States,* 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582, that "the Fourth Amendment protects people, not places," the court said that, nevertheless, "the place involved may be relevant in deciding whether the person ha[d] a reasonable expectation of privacy." (quoting *Commonwealth v. Ortiz,* 376 Mass. 349, 351, 380 N.E.2d 669, 672 (1978)). *Id.* Other relevant considerations included "whether a particular place is a common area, whether it was freely accessible to others besides the defendant, and whether the defendant controlled access to the area." *Id.* (citations omitted). The court concluded that "an individual can have only a very limited expectation of privacy with respect to an area used routinely by others." *Id.*

*See also Buchanan v. State,* 432 So.2d 147 (Fla.App. 1 Dist.1983), in which the court con-

Moreover, when Wagner was given the opportunity to insure that his personal effects would be kept in a private place during his hospital stay, he chose not to do so. We note with interest the fact that Wagner rejected an offer by a hospital employee to have his personal effects, including the gold coin, secured in the hospital safe, thus exposing his property to the possibility that it might be lost, misplaced, or even stolen while he was being treated for his injuries and moved to other areas of the hospital.[8] We conclude that any expectation of privacy which Wagner may have had was not reasonable under the circumstances, but was diminished by the fact that he was a patient being treated for injuries in a hospital emergency room.

■ Although Wagner alleges otherwise, we are satisfied that Pinion's search for identification was not merely a pretext for a larger scale search for evidence linking Wagner to Elswick's murder. We believe, as the trial court specifically found, that Pinion was unaware that Wagner was a murder suspect at this time. We next consider the fact that Trooper Pinion's "search" in this instance was very limited in both scope and purpose. Pinion stated that his sole motivation in looking through Wagner's pants pockets was to find some type of identification so that he could complete his accident report. No one in the busy hospital emergency room responded affirmatively to Pinion's questions regarding the victims' identities, nor was he able to locate anyone who had secured any type of identification. Pinion looked for, but could not find, admissions information, and he also attempted to question Wagner, who did not respond.

We do not doubt the testimony of Supervisor Joyce Dean that she obtained information from Wagner when he arrived at the hospital. However, it does not necessarily follow that Wagner was later in any condition to respond to Pinion's inquiries. In fact, the treating physician in the emergency room testified that Wagner was lethargic and had an abnormal awareness level. He was undoubtedly in pain and was receiving medication that included a sedative. When considered with the fact that Wagner was legally intoxicated with a blood alcohol level of .170, we conclude that Trooper Pinion's search was a legitimate quest for identification.

We realize that the Fourth Amendment protects everyone from all unreasonable searches of their persons, houses, papers and effects. "No matter how minor the intrusion, the government conduct must still be scrutinized under Fourth Amendment standards." 1 Ringel *Searches & Seizures, Arrests and Confessions* § 2.2 (2d ed. 1988). However, "[a] minor intrusion will militate toward a judicial finding of reasonableness under the Fourth Amendment ..." although "it does not exempt the conduct from all scrutiny." *Id.* An examination of the record reveals that Pinion tried to obtain the identification information through other less intrusive measures before he removed Wagner's pants from the basket underneath his bed and looked in the pockets in the hopes of finding his drivers license. Trooper Pinion made an extremely limited search of just Wagner's pants pockets for the sole purpose of locating identification.

cluded that the defendant had no reasonable expectation of privacy in the area underneath a mattress in a hospital emergency room bed, where the defendant attempted to hide a bag containing illegal drugs, because medical personnel were constantly walking in and out of the area and the defendant could have expected to remain there for no more than a few hours; *United States v. Mankani,* 738 F.2d 538 (2nd Cir.1984), acknowledging that occupants of a hotel room are entitled to Fourth Amendment protection but stating that "it is the transitory nature of such places, commonly understood as such, that diminishes a person's justifiable expectation of privacy in them." *Id.* at 544.

**8.** Randall Day, an attendant at Logan General Hospital, testified at the suppression hearing that he was responsible for making sure that the personal property of accident victims who were being admitted was locked up. Day indicated that when he asked Wagner if he wanted the gold coin locked up, Wagner said "no," at which point Day put the coin back into the pants pocket and then returned the pants to the basket beneath the bed. Day stated, "If he wanted it locked up, it would have been."

After scrutinizing Pinion's limited "intrusion" using the appropriate Fourth Amendment criteria, we simply cannot conclude that his "search" was anything other than reasonable under the circumstances. The facts in this case are complicated and not conducive to a typical Fourth Amendment search analysis because Pinion's search of Wagner's pants pockets was not the type of search that is usually challenged as unconstitutional and certainly not the type of search for which it seems reasonable to have expected Pinion to obtain a search warrant. The more typical Fourth Amendment case involves a search that is initiated for the purposes of obtaining evidence of criminal activity. Certainly, however, we recognize that there are numerous instances in which the nature of a police officer's duty requires that he engage in searches for reasons other than obtaining evidence of criminal activity.

> The policeman, as a jack-of-all-emergencies, has "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;" by default or design he is also expected to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "provide other services on an emergency basis." If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court.

2 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 5.4(c) at 525 (2d ed. 1987) (footnotes omitted.)[9]

After reviewing the record of the extensive suppression hearing held by the trial court below, we find that the facts support a conclusion that Trooper Pinion acted both reasonably and in good faith when he searched Wagner's pants pockets for identification, in light of the circumstances in the hospital emergency room which frustrated his attempts to identify these particular accident victims.

■ Although we conclude that Trooper Pinion conducted a reasonable and good faith search, we reject the State's argument that the emergency exception to the warrant requirement justified the search.[10] We adopted the emergency doctrine in *State v. Cecil*, 173 W.Va. 27, 311 S.E.2d 144 (1983), in which we held that the emergency doctrine permitted "a limited, warrantless search or entry of an area by police officers where (1) there is an immediate need for their assistance in the protection of human life, (2) the search or entry by the officers is motivated by an emergency, rather than by an intent to arrest or secure evidence, and (3) there is a reasonable connection between the emergency and the area in question." *Id.* 173 W.Va. at 32, 311 S.E.2d at 149.

■ The application of the emergency doctrine requires the existence of a "compelling need to render immediate assistance to the victim of a crime, or insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection." *Id.* at 150 (citing *State v. Kraimer*, 99 Wis.2d 306, 315, 298 N.W.2d 568, 572 (1980)). The facts of this case provide no evidence of precisely this type of medical emergency,

**9.** LaFave notes that the Supreme Court has never ruled on precisely this type of search, but cites *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), in which the Court, "in upholding the warrantless search of a vehicle, made specific reference to the necessity for local police to engage in 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" 2 LaFave, *supra* § 5.4(c), at 525 n. 32.

*But cf. United States v. Pichany*, 687 F.2d 204 (1982), in which the Seventh Circuit Court of Appeals refused to extend the "community caretaking" exception to the Fourth Amendment

warrant requirement to the warrantless search of the defendant's unlocked warehouse, where the officers were not investigating the defendant's involvement in any crime but discovered stolen farm equipment while investigating an unrelated burglary.

**10.** We also reject the State's initial argument that the search issue has been previously litigated within the meaning of W.Va.Code § 53–4A–1(b) (1981). We are not satisfied that the issues now raised in this petition were adequately presented to this Court in Wagner's previous *pro se* petitions.

as Wagner was already receiving treatment for his injuries.[11]

We find instead that Pinion's search in this case was very similar to "a limited search for identification ... undertaken to facilitate a noncriminal disposition of a person in police control." 2 LaFave, *supra* § 5.4(c) at 526. LaFave states that in this situation it is "clearly unnecessary to find a reasonable belief of a medical emergency." *Id.*[12]

However, we do not feel compelled to categorize our holding by placing this "search" within one of the exceptions to the warrant requirement. As this Court stated in *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559, 575, "Some cases fall between the categories. The labels do not always fit. Many decisions turn, not upon the labels, but upon a close analysis of the facts." *Id.* 167 W.Va. at 563, 280 S.E.2d at 575 (quoting *Carlton v. Estelle*, 480 F.2d 759, 761 (5th Cir.1973)). We concluded that a decision in any given case "must turn on the facts of that particular case examined in the light of the purposes served by the Fourth Amendment and the interests protected by that amendment." *Id.*

We conclude that Pinion's warrantless search of Wagner's pants pockets did not violate Wagner's right to be free from an unreasonable search as it was a reasonable and good faith attempt to locate necessary identification of an accident victim, as required by law. Nor do we find that Pinion's search invaded Wagner's reasonable expectation of privacy. Although injured persons being treated in a hospital emergency room are entitled to Fourth Amendment protections, the degree of privacy they are reasonably entitled to expect may be diminished by the circumstances under which they are brought into the hospital. We thus affirm the holding of the trial court below as to the propriety of this search and agree as well with the trial court's conclusion that the subsequent warrantless seizure of the gold coin was based upon probable cause to arrest Wagner and justified by the exigent circumstances present at that time.

III.

We will now address the defendant's second assignment of error which involves the trial court's admission of testimony regarding a letter Chatwan Smith alleges Wagner wrote to her without requiring production of the actual letter.

Chatwan Smith testified at trial that when Wagner returned home on the morning of July 21, 1982, he told her he had "robbed and shot a man." During cross-examination, Wagner's defense attorney, Mr. Davis, introduced a letter written by Smith to Wagner in August, 1982. In the letter, she wrote, among other things, that the "... cops are actually trying to blame you for a murder you didn't commit" and "[t]heir [sic] not going to stick you with know [sic] bad rap and keep us apart for the rest of our life...." Smith also referred to money, stating "Say I know they got your money (the cops) so ask them to get your cigarettes or the trustee cause that money on you is yours."

Mr. Davis indicated that the purpose of introducing the letter was to contradict Smith's testimony on direct examination, and thus impeach her credibility as a witness. Mr. Davis stated, "She says in this

11. *See generally* Bacigal, *The Emergency Exception to the Fourth Amendment*, 9 Rich.L.Rev. 249 (1975); Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buff.L.Rev. 419 (1973).

12. To illustrate this point LaFave cites language from *State v. Newman*, 49 Or.App. 313, 619 P.2d 930 (1980), *rev'd* 292 Or. 216, 637 P.2d 143 (1981), *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982), in which the police placed an intoxicated woman in their care under a "civil hold." The police were acting pursuant to a statute which permitted them discretion in deciding whether to take intoxicated persons home rather than to jail. When the woman could not or did not supply them with identification, they searched her purse for identification and found drugs. The court stated that "[t]he search of defendant's purse for identification was neither physically nor psychologically intrusive and was, under the circumstances of this case, the most efficient means of ascertaining her identity." 2 LaFave, *supra*, at 527.

letter that this money belongs to Mr. Wagner and that he had not shot and killed anyone and that is what we are trying to straighten out."

On redirect examination, the prosecuting attorney, Mr. Ward, questioned Smith about statements in the letter. Smith stated that the money she was referring to in the letter was money she had received from a "date" and then gave to Wagner. She said she referred to this as his money that the police had taken from him in addition to the money belonging to Dwight Elswick. Smith was then asked if she was "lovesick" when she wrote this letter to Wagner, and she replied, "Yes. I missed him." The redirect examination of Smith continued as follows:

Q. You had been away from him a little bit at that time?

A. Yes.

Q. You wrote in that letter they were trying to put a bad rap on him for a murder he hadn't done?

A. Yes.

Q. Was that in response to a letter by this defendant?

A. He had wrote a letter to me telling me he didn't kill the man, so I was just responding to his letter and letting him know if he hadn't killed the man he should tell what had happened.

Q. Was he beginning to make you believe he hadn't done it?

A. I really didn't know, because I wasn't there.

Q. Did he ask you to do anything else in that letter?

A. Yes. He told me to say it was prostitute money and that—

At this point defense attorneys objected to Smith offering testimony from a letter that was not in evidence. Smith then indicated that the letter she had received from Wagner was at her home in Dayton, Ohio. The objection was overruled and Smith was allowed to testify as to the contents of the letter. She stated that in the letter she received from Wagner, "He wanted me to

say it was prostitute money and how he had hustled by shooting pool and playing cards and shooting craps." Smith said that Wagner was asking her to lie for him.

Wagner contends that he was denied due process of law when Chatwan Smith was allowed to testify regarding the contents of a letter not before the Court as the testimony was used to rehabilitate a crucial witness for the State. He states that he was denied his constitutional right to confront his accusers and that admission of this testimony created "circumstances impugning fundamental fairness."

We reject Wagner's contention that Smith's testimony regarding the letter she said she received from Wagner violates West Virginia Rule of Evidence 1002, also referred to as the best evidence rule.[13] An applicable exception to the best evidence rule is found in W.Va.R.Evid. 1004(4), which states that an original writing is not required and other evidence of the contents of a writing is admissible if the writing "is not closely related to a controlling issue." Cleckley states that:

> If the writing or document is considered as evidence relating to a matter which does not form the foundation of the "cause of action or defense" the best evidence rule does not apply.... A writing is collateral if under the circumstances it is of such minor importance that no useful purpose would be served in requiring its production. *State v. Clark*, 64 W.Va. 625, 63 S.E. 402 (1908); Rule 1004(4). For example, the impeachment of a credibility witness as to his prior written statement that he "believed the accused should be hung."

Cleckley, *Handbook*, at § 9.3(F)2.d. In this case, Smith's statement about receiving a letter from Wagner was relevant only in the sense that it was her explanation for why she wrote the letter which was admitted into evidence and which contradicted her direct testimony that Wagner told her

---

**13.** West Virginia Rule of Evidence 1002 states: Requirement of Original. To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute.

he robbed and shot a man.[14] The credibility of witness Smith was an issue to be decided by the jury and we believe there was sufficient evidence before the jury upon which they could base this determination without requiring the production of the letter.

Finally, having found that the trial court committed no error when it admitted Smith's testimony regarding the letter without requiring the production of the letter, we conclude that Wagner suffered no due process violation or other substantial prejudice which affected the outcome of his trial.

Finding no reversible error, we affirm the decision of the trial court below.

Affirmed.

McGRAW, J., participated and concurred in this decision but departed from the Court prior to the preparation of the opinion. WORKMAN, J., did not participate in the consideration or decision of this case.

MILLER, Justice, dissenting:

I respectfully dissent. One of the principles of law firmly planted in our Fourth Amendment jurisprudence is that a search made in the absence of a warrant is conclusively presumed to be unreasonable. To justify a warrantless search, it must be fitted within one of the narrow exceptions derived from the case law. This principle finds expression in *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967): "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." (Footnotes omitted).

I am distressed that the majority so readily departs from this settled law.[1] In spite of the clarity of the language in *Katz*, the majority weakens it by stating that "[t]he labels [for exceptions to the warrant requirement] do not always fit." For this reason, decisions in warrant cases must "turn ... upon a close analysis of the facts." 181 W.Va. at 490, 383 S.E.2d at 294. I submit that the majority's approach turns *Katz* into a dog.

The majority asserts that it refuses to apply the emergency exception to the facts of this case.[2] I recognize that courts in other jurisdictions have authorized a warrantless search of an individual for identification when an officer encounters someone who is unconscious or otherwise unable to respond to questions even though there is

---

**14.** Wagner also argues that the State failed to provide a foundation for the introduction of the secondary evidence of Smith's testimony. However, it was Wagner's attorney who introduced Smith's handwritten letter to Wagner into evidence in an effort to impeach her credibility by showing that her own letter contained statements which were inconsistent with her direct testimony. Once Smith's letter was admitted into evidence, she was entitled to explain any apparent inconsistencies between what she wrote in the letter and what she said Wagner told her on the night in question. "Under Rule 613, if extrinsic evidence of the prior statement is to be admissible, the witness who made the prior statement must be given the opportunity to explain or deny it." Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.1(B)2.c (2d ed. 1986). Smith explained that she wrote the letter that was introduced to impeach her direct testimony in response to a letter she received from Wagner. She stated that in his letter Wagner told her that "he didn't kill the man" and asked her to "say it was prostitute money." The defense made no hearsay objection to Smith's testimony.

**1.** We have followed this rule in a number of cases, as illustrated by Syllabus Point 1 of *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980):
"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative."
See also *State v. Choat*, 178 W.Va. 607, 363 S.E.2d 493 (1987); *State v. Cook*, 175 W.Va. 185, 332 S.E.2d 147 (1985).

**2.** This exception is limited to circumstances that involve "[t]he need to protect or preserve life." *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978); *State v. Cecil*, 173 W.Va. 27, 311 S.E.2d 144 (1983).

no immediate medical emergency. The purpose of this "caretaker" function is to put the individual into some more secure place for his own protection and, necessarily, involves determining identity in order to contact family or other relatives. *E.g., Vauss v. United States,* 370 F.2d 250, 125 U.S.App.D.C. 228 (1966); *Gilbert v. State,* 289 So.2d 475 (Fla.App.1974); *People v. Smith,* 47 Ill.2d 161, 265 N.E.2d 139 (1970); *State v. Miller,* 486 S.W.2d 435 (Mo.1972); *Perez v. State,* 514 S.W.2d 748 (Tex.Crim. 1974).

It should also be stressed, as Professor LaFave points out in his treatise, that the Supreme Court of the United States has never held that caretaker activities may justify a warrantless search.[3]  2 W. LaFave, *Search and Seizure* § 5.4(c) at 525 n. 32 (1987). The *Newman* case,[4] cited by the majority, is easily distinguished. *Newman* permitted a limited search for identification to enable police officers to return an inebriate to his home. This authority was derived exclusively from statute. *Newman* cannot be read to throw open the door to warrantless searches in other nonemergency situations.

It is obvious, however, that "caretaker" facts simply do not exist in this case. The defendant was not in control of the police. He was at the hospital in control of the people in the emergency room. There was no need for the police to exercise a caretaker function when the defendant was already in competent medical care. The majority's solicitous concern over the possible loss of the defendant's clothing and personal effects as motivating the caretaker officer cannot be treated seriously. This is because after the officer rummaged through the defendant's personal effects, he made no effort to have them placed in a more secure place.

The sole basis, then, on which the majority rests its decision is the duty to report vehicular accidents under W.Va.Code, 17C–4–7. This section requires police officers to prepare a report of every vehicular accident and to forward the same to the department of motor vehicles. This is a far cry from the type of exigency[5] required to override an individual's reasonable expectation of privacy.

Finally, I am led to conclude, contrary to the majority, that the officer's search for identification was merely a pretext for a broader search for evidence. Even the majority credits the testimony of the emergency room supervisor, who stated that identifying information was received from the defendant on his arrival. This information was recorded and the record was made available at the admissions desk. By his failure to inquire at the admissions desk, the officer ignored standard hospital procedure.

Other testimony also casts doubt on the innocent nature of the search. For example, the officer says that he questioned emergency room staff about whether the defendant's identity was known. This fact is uncorroborated by any of the seven doctors, nurses, and orderlies who were on duty that night. Also notable is the fact that the all points bulletin for the defendant was issued at least two hours before the search was made. It is fairly inferable that the officer knew of the bulletin at the time of his search.

---

**3.** *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), relied on by the majority, does refer to "caretaking" activities of local police in regard to an automobile which had been towed from the scene of an accident. This reference was made to support the proposition that since local police have routine contact with motor vehicles, they may be treated differently from houses for Fourth Amendment purposes. *Cady* does not, therefore, stand for the broader proposition for which it is cited by the majority.

**4.** *State v. Newman,* 49 Or.App. 313, 619 P.2d 930 (1980), *rev'd,* 292 Or. 216, 637 P.2d 143 (1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982).

**5.** I am unimpressed by the majority's attempts to emphasize as an "emergency" the need to locate identifying information as promptly as possible. W.Va.Code, 17C–4–7, requires only that the officer's report be forwarded within twenty-four hours of the completion of his investigation. Presumably, the investigation would remain incomplete until the identity of those involved in the accident was ascertained.

Most damaging of all is the testimony of Randall Franklin Day, the orderly who prepared the defendant for treatment. Day states that even before he removed the defendant's pants or searched for identification, he was directed by the officer to search the defendant's jacket for a weapon. One may reasonably wonder why the officer would make such a request if he believed the defendant simply to be an accident victim. Also overlooked by the majority is Day's statement that he located a billfold in the defendant's pants and handed it to the officer for his review. Day's testimony clearly belies the State's theory that the search was one for identification only.

For these reasons, I respectfully dissent.